ROBERT G. DOWD, JR., Presiding Judge
Dr. Henry Walden and St. Louis University (collectively "Defendants") appeal from the multi-million dollar judgment entered after a jury trial on claims that they had overprescribed opioids to Brian Koon and caused him to become addicted, resulting in damages to him and his wife (collectively "Plaintiffs"). On appeal, Defendants challenge the denial of a mistrial during voir dire, the admission of certain evidence, the punitive damage instruction and the submissibility of all of the claims against them. We affirm.
The evidence at trial showed the following. Opioids-drugs such as oxycodone, oxycontin and hydrocodone-are a class of prescription pain relievers derived from synthetic versions of opium. All opioids *756 have a similar effect on the brain. Opioids work by binding to receptors in the brain that control the perception of pain. They do so in generally the same way that heroin does and produce the same euphoric effects. There are serious risks associated with opioids, including tolerance, dependency, addiction, life-threatening respiratory depression, overdose and death.[1] As patients take opioids, they develop tolerance and need more and more medication over time in order to achieve the same level of pain relief. Opioids change a patient's brain to make the body physically and psychologically dependent on the medication. All patients who use opioids for long enough will become tolerant and dependent, and some will become addicted. Addiction is a disease characterized by habituation, craving and preoccupation with obtaining and taking the drug.
Opioids are dangerous, and most are categorized as Schedule II drugs by the Drug Enforcement Administration, the classification for the most potent legal drugs and the ones that have the potential to do the most harm. Opioids should only be prescribed for severe enough pain that is not adequately relieved by alternative non-narcotic treatment, Opioid therapy should begin at the lowest effective dose of immediate-release opioids and go up slowly if needed. Opioids should be stopped as soon as possible.
The standard of care requires doctors to conduct a risk assessment with the patient before prescribing opioids, in which they discuss the risks versus the benefits of giving opioids to the particular patient for the particular pain. The risks and benefits should be re-assessed at an office visit each time the dose of an opioid is increased. Once a patient is taking opioids, he or she should be monitored regularly, meaning regular contact to assess pain levels and functioning and to check for side effects and behaviors that would suggest the patient is becoming addicted. The risk assessments and the results of monitoring a patient should be documented in the medical records.
Doctors must also keep track of the amount of opioids-number of pills and dose-that the patient is taking. The standard of care requires all healthcare providers to have a medication management system in place to make sure patients do not receive too many opioids. The maximum daily dose recommended for a patient with non-cancer pain is between 90 and 120 milligrams MED.[2] Though this upper limit is not contained in any textbook, law or label, it has been the standard for many years to help primary care doctors recognize when it is time to refer a patient elsewhere. If a patient's pain is not adequately controlled by around 100 milligrams MED of opioids, then he or she should be referred to a pain management specialist because by 200 milligrams MED, the risk of addiction, abuse and dying increases sharply. One study from 2009 found that 1 in 32 patients who escalated to taking above 200 milligrams MED died from opioid related overdose. A group of physicians recommended in 2012 that the Food and Drug Administration require labels on opioids that would set a maximum daily dose of 100 milligrams MED for a maximum length of 90 days and that would explain that long-term opioid use had not *757 been proven safe and effective for chronic non-cancer pain.
Warning signs that a patient is dependent or addicted to opioids include patterns of early refills, asking for higher doses, taking multiple doses at once and exhibiting a loss of control over the ability to take the medication as prescribed. Patients who become addicted to opioids cannot themselves articulate the effect the increased doses of medication are having on their lives and will continue taking medicine despite those adverse effects. If a doctor suspects the patient is addicted, he should cease opioids and help the patient wean off of them.
The risks associated with opioids were generally agreed upon by all the doctors who testified at trial, both those who testified as experts for plaintiffs and defendants and the defendants themselves. The risks were well known to anyone prescribing these drugs, including Dr. Walden and SLU. Similarly, there was no real dispute at trial that healthcare providers should weigh the risks and benefits of opioids, should prescribe the lowest effective dose for the shortest amount of time and only when other modalities of treatment are ineffective, should monitor their patients carefully and assess them for signs of dependency and addiction.
Dr. Walden had been Brian Koon's primary care physician since 2001. Koon experienced intermittent lower back pain, which became more regular in 2008 after he threw his back out and fell while drying off from a shower. A visit to the chiropractor did not resolve all of the pain, so Koon went to see Dr. Walden on February 21, 2008 complaining of significant back pain. The pain was restricting his ability to do certain jobs at work. After examining him, Dr. Walden ordered x-rays and told Koon to continue using a muscle relaxer and ibuprofen as needed. The x-rays were normal. About a week later, Koon called Dr. Walden's office complaining that he still had "discomfort" in back, which the ibuprofen was helping on "some days." He asked the doctor to prescribe pain medication. Dr. Walden wrote a prescription for 30 pills of hydrocodone[3] with one refill, to be taken as needed every six hours. There is a notation in the medical record that he discussed the prescription with Koon, but Dr. Walden could not recall the details of that conversation. He agreed that a physician must weigh the risks and benefits of prescribing an opioid each time the patient is started or continued on the drug. This is something he admitted he should have done with Koon and believed he had done with Koon, but could not recall the specific times he did so and had no documentation of the details of any such discussion, except for one, discussed below.
On March 31, 2008, Koon called Dr. Walden's office and requested a refill of the hydrocodone, explaining that he was taking double the amount of pills directed by his prescription. Dr. Walden prescribed more. On April 1, 2008, Dr. Walden saw Koon in his office, noting that he continued to have "back discomfort" and continued worsening of the pain, especially at the end of the work day, which was helped by taking two to three hydrocodone pills. Dr. Walden prescribed more pills and ordered an MRI. Koon called Dr. Walden's office a couple of weeks later asking for the results of the MRI and again reporting "having to take more than the prescribed dose" of hydrocodone for it to work. Dr. Walden increased the dose of hydrocodone. Dr. *758 Walden also referred Koon to an orthopedic surgeon, who said the MRI did not show a need for surgery and referred Koon to physical therapy. Koon saw another surgeon that he sought out himself for a second opinion, and that surgeon reached the same conclusions, but referred Koon to a pain management doctor. She treated Koon with spinal steroid injections from time to time.
On July 8, 2008, Koon left a message with Dr. Walden's office stating that he increased the amount of hydrocodone he was taking and then tried to decrease it but "felt very bad, shaky, nose running, sweating, weak, yawning and moody." When he took the medicine, he felt better within an hour. Koon said he "needs help." Dr. Walden did not call Koon back or ask him to come in for an office visit; he just authorized another refill without speaking to Koon. On August 19, 2008, Dr. Walden saw Koon in his office. His notes indicate that Koon was doing better with back pain, receiving injection therapy and taking hydrocodone six times a day with "plans to wean back in one week." Dr. Walden noted that Koon desired to return to full work duty. Dr. Walden indicated the plan was for Koon to continue the hydrocodone but cut himself back on how often or how many pills he took. Dr. Walden did not change the hydrocodone prescription.
On February 10, 2009, another SLU doctor saw Koon for an office visit and recommended switching from hydrocodone to another type of opioid called oxycontin, which is the long-acting version of oxycodone ("contin" meaning "continuous"). He prescribed that to Koon and told him to follow up with Dr. Walden. A week later, when Koon went to see Dr. Walden, it was noted that Koon continued to have pain, but was tolerating the oxycontin well with no adverse effects. Koon reported that the oxycontin was wearing off quicker than he would like and had not eliminated the pain. Dr. Walden continued to prescribe the hydrocodone in addition to the oxycontin. Dr. Walden knew that oxycontin in combination with other opioids can increase the risk of respiratory depression.
On August 20, 2009, Koon saw Dr. Walden and reported continued back pain, some relief from the hydrocodone and oxycontin, though it did not seem as potent as it once was, and said he tolerated the medicine well. At this visit-a year and half after starting him on opioids-Dr. Walden notes that they discussed the possible adverse effects and risk of dependence and both agreed that the benefits clearly outweighed the risks. By October of 2009, Dr. Walden had added immediate-release oxycodone to the hydrocodone and oxycontin already being prescribed to Koon. He continued to prescribe all three opioids at the same time in increasing amounts during 2010 and 2011. Koon was also taking sleeping medication and sedatives at the same time as the opioids, which exposed him to a higher risk of life-threatening respiratory depression.
At Koon's request, Dr. Walden sent him to another pain management doctor in April of 2012, who diagnosed opioid dependence, recommended treating that, gave Koon injections and referred him to a psychiatrist. On May 24, 2012, Koon and his wife went to Dr. Walden's office after she called to discuss weaning off the opioids. Koon was in tears asking the doctor to get him off the medication and telling him that the pills were running his life. Koon said he told Dr. Walden about the fact that the pain management doctor said he was on too much medication and would not take over his treatment because of the amount of drugs he was on. Dr. Walden noted at that visit that Koon was tolerating the medicine well, denied noncompliance and had no new adverse effects.
*759 In July of 2012, the pharmacy called Dr. Walden concerned about the large amount of opioids in the prescription Koon was trying to fill; Koon's wife also called the same day saying she had tried hiding the medicine from Koon, but he found it and took it all. Dr. Walden stated that this is when he and the other providers involved began trying to taper down one of Koon's drugs, the immediate-release oxycodone. In August of 2012, the pharmacy refused to fill Koon's prescriptions, so his wife called Dr. Walden and he wrote a new prescription. Before she could pick it up, Koon's withdrawal symptoms got worse and his wife admitted him to a rehab facility. After completing the rehab program, Koon had several surgeries on his lower back. Koon was diagnosed as having severe opioid use disorder, which is similar to a diagnosis of addiction.
Koon and his wife testified that they regularly had to call Dr. Walden's office for early refills because Koon would run out early and have withdrawal symptoms. The prescription would be refilled-and sometimes the dose increased-without Dr. Walden talking to either of them. Sometimes, Dr. Walden would prescribe morphine to fill the gaps in prescriptions that could not be refilled early. Koon admitted he asked for these increased doses and early refills and wanted treatment for his back pain so he could keep working and provide for his wife and young daughter, At first, he said, the opioids helped him be able to work, but eventually the effects of the opioids interfered with work more than the pain had. The medications also interfered with his relationship with his daughter and his wife. His focus became solely his pain medications. The drugs ran his life: they were all that mattered to him, and everything revolved around the opioids. He had no control over it. Dr. Walden agreed that Koon exhibited a lack of control over his medications toward the end of his course of treatment with Dr. Walden, though he still claimed to believe only that Koon was dependent on the drugs and could not say that he was addicted.
The parties stipulated to the amounts Koon was prescribed between February 2008 and August 2012. In 2008, Koon's average daily dose of opioids was 49.67 milligrams MED. The following year, it was up to 208 milligrams MED on average per day. In 2010, Dr. Walden more than doubled that to an average daily dose of 545.59 milligrams MED. In 2011, he doubled it again, reaching 1,173.37 milligrams MED per day. By 2012, Koon was prescribed, on average, 1,555.94 milligrams MED a day. Koon went from a prescription for six pills a day to almost forty pills of opioids a day between the three prescriptions.
Plaintiffs' expert described these doses as "excessive," "colossal," "reckless," "extraordinary" and "astronomical" and said they exposed Koon to a very high risk of injury, including addiction. This is the very pattern of prescribing that state licensure boards and the DEA are trying to protect patients from because it "exposes a patient to a very high risk of dying for backache." In his opinion, there was "no legitimate medical purpose" for Dr. Walden to prescribe Koon opioids in these amounts and for this length of time. In fact, he opined, a patient with low back pain should never be treated with chronic opioid therapy by a primary care doctor. Moreover, Dr. Walden did not conduct a risk and benefit assessment that met the standard of care in this case, nor was there any system in place to adequately monitored Koon's use of opioids in accordance with the standard of care, The expert testified that these deviations from the standards of care for treating a patient with opioids caused or contributed to Koon's injuries.
*760 SLU admitted Dr. Walden was its employee and had prescribed all of Koon's opioids in the course of that employment, SLU also acknowledged that Koon was its patient and that it agreed to treat him, through its physicians. SLU does not monitor the amount of opioids that are prescribed to its patients. SLU's representative at trial said SLU saw no reason to monitor opioids any differently than other medications. A one-page policy from 1998 is the only standard SLU has in place for prescribing controlled substances, and it merely specifies what needs to be on the prescriptions and how records thereof must be maintained. SLU was aware of the risks associated with opioids and agreed that its physicians should conduct risk-benefit analysis, monitor patients and assess them for signs of addiction. SLU's representative agreed that a dose in excess of 1,500 milligrams MED was an "unusually high amount."
The jury was instructed that they must assess a percentage of fault to Defendants if they believed Dr. Walden and SLU either (a) failed to weigh the risks and benefits of prescribing opioids to Koon, (b) overprescribed opioids to Koon, (c) failed to monitor Koon's opioid treatment or (d) failed to assess him for dependency or addiction. The jury also had to find that this conduct was negligent-in that Defendants failed to use the degree of skill and learning ordinarily used under similar circumstance by members of Defendants' profession-and that this negligence caused or contributed to cause Plaintiffs' damages. The jury was instructed that they could find Defendants liable for punitive damages if they determined that Defendants knew or should have known that this conduct created a high degree of probability of injury and thereby showed complete indifference to or conscious disregard for the safety of others. They were also instructed to assess a percentage of fault to Koon if they believed he either failed to provide information to Dr. Walden, failed to weigh the risks and benefits, failed to follow Dr. Walden's instructions for opioid use or failed to follow instructions for weaning off the medications.
The jury returned a verdict in Plaintiffs' favor on their claims for compensatory damages, assessing 67% of the fault to Defendants and 33% to Koon. Judgment was entered, awarding Koon $938,000 and his wife $804,000 in compensatory damages. Judgment was also entered on the jury's verdict finding Defendants liable for punitive damages in the amount of $15,000,000. This appeal follows.
Admission of Opioid Epidemic Evidence
Defendants claim the trial court erred in admitting evidence of and allowing repeated references to a nationwide "opioid epidemic." They argue this evidence was irrelevant and highly prejudicial because its only purpose was to mislead the jury to believe that they should hold Defendants accountable for the epidemic. They contend that allowing this evidence resulted in a verdict that held Defendants responsible for harm to non-parties caused by other non-parties in unrelated situations. We disagree.
Evidence must be both logically and legally relevant to be admissible. Crow v. Crawford & Company, 259 S.W.3d 104, 122 (Mo. App. E.D. 2008). "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 116 (Mo. banc 2015). "Logical relevance has a very low *761 threshold." Id. at 130. Determining legal relevance requires the trial court to balance the probative value of the proffered evidence against its prejudicial effect on the jury. Id. at 122.
Although only relevant evidence is admissible, the trial court is accorded "considerable discretion" when making the "subjective determination of relevancy." Ziolkowski v. Heartland Regional Medical Center, 317 S.W.3d 212, 216 (Mo. App. W.D. 2010). Thus, we give great deference to the trial court's evidentiary rulings, presume that the ruling is correct and will reverse only if the court clearly abused its discretion. Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 872 (Mo. App. E.D. 2009). If reasonable persons could disagree about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Id. Rather, an abuse of discretion occurs when the ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id. Only if there is "a substantial or glaring injustice" will we disturb a trial court's ruling on the admission of evidence. Carlson v. Saint Louis University, 495 S.W.3d 777, 779 (Mo. App. E.D. 2016).
Defendants claim that evidence about the opioid epidemic was "persistently injected" throughout the trial, including during opening statement and closing argument. In its brief, Defendants cite "examples" of the offending evidence, suggesting there is other evidence about the opioid epidemic in the record they have not bothered to cite, but that warrant reversal. We can only review the admissibility of the evidence for which the appellant actually provides a citation to the transcript. Block Financial Corporation v. America Online, Inc., 148 S.W.3d 878, 890 (Mo. App. W.D. 2004) (court has no duty to search transcript where appellant does not identify specific testimony or other objectionable evidence and does not cite to transcript or legal file where evidence was admitted; point is not preserved for appellate review, even when reply brief attempted to correct problem). Thus, here we will review only the evidence for which Defendants have provided a citation to the transcript.
Defendants first cite to testimony by Plaintiffs' expert, Dr. Paul Genecin. On direct examination, Dr. Genecin discussed the well-known risks associated with prescribing opioids, and then he was asked:
Q: Okay. Doctor, is there a recognized problem with overprescribing of opioid narcotics?
A: Yes. There's been a marked increase of prescription of opioid narcotics, and that's been going on for the past 15 to 16-
Defendants objected that references to the opioid epidemic were irrelevant and prejudicial. The court overruled the objection, finding that although there was "some prejudice" from this evidence, the probative value outweighed the prejudice. Dr. Genecin went on to testify that the topic of prescription opioid use and misuse had been well covered in the popular media and in medical publications.
The next challenged testimony is that of SLU's corporate representative, Dr. Robert Heaney, the CEO of SLUCare. Defendants set out in the brief the following particular exchange;
Q: Okay. St. Louis University and SLUCare and Dr. Walden and you have known about this problem, this epidemic, for some time now, correct?
*762 A: We would have known about the increasing problem with opioids, yes.
They cite to several other pages of the transcript on which Dr. Heaney testified, which include the following testimony. Dr. Heaney said the problem of opioid misuse and abuse had gone on for a while and had been increasing. He agreed that an article counsel presented to him stated that opioid consumption had increased by 300% between 1999 and 2010, that since 2002, deaths from prescription drugs had surpassed those from cocaine and heroin combined and the rate of overdose deaths had increased 19% per year from 2000 to 2006. Dr. Heaney testified that, at a corporate level, SLU was not aware of studies finding that 1 in 550 of patients receiving opioids for chronic non-cancer pain had died of overdose within a median of 2.6 years from their first prescription, but he said some of SLU's physicians may have been aware of it. He did not know whether SLU was, at a corporate level, aware of the study finding that 1 in 32 patients who escalated to opioid doses greater than 200 milligrams MED had died from opioid-related overdose, but he was sure some SLU physicians were aware of it, Dr. Heaney insisted that even based on what was known at the time of trial, SLU would not change the way it monitors the use of opioids, Although no death should be minimized, Dr. Heaney pointed out that 31 of the 32 patients in the above study "did okay and needed those medications." He also acknowledged that the greater the dose of opioid, the greater the potential for problems and the greater the need for monitoring.
Defendants next point to the testimony of their own expert, Dr. Erik Gunderson,[4] who said on cross-examination that "we're in the midst of a prescription opioid epidemic in our country" and then explained his perception of it:
Yeah. I alluded to it a little bit earlier, about how things have come about. Many people think that this began in the mid '90s with the promotion of the concept of pain being the fifth vital sign, in quotes.... So, any time that you might be at a clinician's office where you might be getting regular vital signs measured, this idea of pain as the fifth vital sign would include that you should be asked about your pain. And that that pain should be qualified on a ten-point scale. And, so, coupled with that idea that pain be included as a vital sign, physicians should be asking you about your pain. Also that we need to be more aggressive about pain. That pain management was deemed a right, you know, a human *763 right, that we need to be treating pain. And, so, pain, as a problem of being under treated, raised-got raised in awareness. And simultaneously there were pharmaceutical companies that were then promoting their medication as safe and saying if you are treating, for example, with a long-acting preparation, oxycontin, for example, for chronic non-cancer pain, that the risk of addiction is very low. And the data that they cited was poor-it was poor quality data. And with that promotion was the idea-so pain is under treated, we need to treat pain, we need to treat it at every visit, and this is a safe thing to do, especially with long acting. So long-acting prescriptions went up. And then other factors involved-and so this led, in part, to an increase in prescribing.
Dr. Gunderson testified that approximately 17,000 to 19,000 people a year are dying from prescription opioid overdoses, the number of opioid prescriptions filled each year is close to the number of people in the United States, there are physicians who are "way overprescribing opioids" and he supports the "fight against the epidemic."
All of the above evidence meets the "very low threshold" for logical relevance in this case. The information was discussed in the context of how the opioid epidemic was well known: Dr. Genecin talked about how it was covered in the media, and Dr. Heaney talked specifically about SLU's and its physicians' awareness of the problem. Dr. Gunderson's explanation of the epidemic gave further context to a physician's decision to prescribe opioids in this environment. All of this evidence was probative of the critical issue for finding Defendants conduct to be negligent, which required a determination of how their conduct compared to what others in the profession were doing under similar circumstances. It was even more probative of facts related to Plaintiffs' request for punitive damages, which required a determination of whether Defendants knew or should have known that there was high degree of probability of injury to Koon or others from prescribing him these unusually high amounts of opioids. Defendants' knowledge of the existence and extent of the epidemic-the amount and rates at which people were being prescribed, becoming addicted to, overdosing on and dying from opioids prescribed by other doctors in this country-was probative of whether Defendants' conduct rose to the level of reprehensibility contained in the punitive damages instruction. In short, evidence about the environment in which Koon was being prescribed these opioids-that is, at a time when the problems with prescription opioids had reached epidemic proportions-was logically relevant because it tended to make more or less probable the facts necessary to show the relevant standards for imposing liability and punitive damages.
As to legal relevance, we find no abuse of discretion in the trial court's conclusion that the potential for prejudicial impact was outweighed by the probative value of this evidence. Defendants argue that because their knowledge of the epidemic was "not a disputed issue in the case," the only reason Plaintiffs interjected evidence of the opioid epidemic was to confuse, distract and mislead the jury into punishing Defendants not for this doctor's actions, but for the national opioid epidemic and unrelated actions. First, the probative value of the evidence was not lost simply because Defendants did not dispute-or presented no evidence to contradict-the existence of the epidemic or their knowledge thereof. Second, despite Defendants' insistence that the opioid epidemic was "the pervasive theme" of trial, our review of the transcript reveals that the great *764 majority of the evidence in this case was specific to Dr. Walden's actions, how he deviated from the standard of care and the degree of reprehensibility of his conduct. Therefore, the jury was not forced to rely on the opioid epidemic to hold Defendants responsible for Koon's injuries. In fact, the jury's conclusion that Koon was partially at fault in this case demonstrates that they were not confused and did not simply impose liability of Defendants because of the opioid epidemic. Rather, they considered how much the conduct of this patient and this doctor caused or contributed to Koon's damages. Likewise, contrary to Defendants' claim that the jury was asked to punish SLU and Dr. Walden for participating in the opioid epidemic or for the harm others caused to non-parties, there is no reason to believe the jury misunderstood the requirements set out in the punitive damages instruction, discounted the significant evidence about this particular doctor's conduct and instead imposed punitive damages solely because they were upset about the larger opioid crisis. In fact, the jury was expressly instructed that they could not include "damages for harm to others who are not parties to this case" when determining the amount of punitive damages.
Finally, we find no merit in Defendants' comparison of the opioid epidemic evidence here to dissimilar prior accidents in a products liability case and uncharged misconduct in a criminal case. At oral argument, Defendants asserted that much of the opioid epidemic evidence included statistics about other types of drugs, not just opioids, and about overdoses and deaths resulting from misuse and abuse of prescription opioids, which is not what occurred here. Although there are a couple specific statistics contained in the cited evidence above that are not clearly limited to opioids, the remainder of the evidence about the epidemic above is specific to opioids and not otherwise limited to misuse or abuse thereof. Thus, admission of this evidence did not pose the same risk of undue prejudice or confusion that admission of uncharged crimes or wholly unrelated other accidents or injuries might.
The ruling was not clearly against the logic of the circumstances before the trial court, nor was it an arbitrary or unreasonable decision to admit this evidence. Rather, the record shows that the court carefully and repeatedly considered the admissibility of this evidence and engaged in the subjective balancing test of probative value versus prejudicial impact before, during and after the trial. Our sense of justice is not shocked by the trial court's conclusion to allow this evidence, nor did it result in "a substantial or glaring injustice." Carlson, 495 S.W.3d at 779. Because we find no error in the admission of this evidence, we also find no error in the references to it during opening statement and closing argument.
Denial of Mistrial During Voir Dire
In a related argument, Defendants contend the trial court erred in denying a mistrial during voir dire. This argument is based on Defendants' speculation as to the association between counsel's explanation of punitive damages and a prospective juror's comment about the larger program of prescription painkillers and is wholly without merit.
During voir dire, Plaintiffs' counsel explained that punitive damages are "not to compensate the party for the harms and losses" but "to punish the defendant and to deter the defendant and others from like conduct in the future." A venireperson then asked "do those punitive damages go to the defendants, or-where does that money go?" Counsel answered "All I can tell you is they're not to compensate the plaintiff. I don't believe I can tell you *765 where they go." Defendants' counsel objected that it was misleading to say that plaintiff would not get any of the money if punitive damages were awarded. There was a discussion about how best to answer this question, and then Defendants' counsel asked the court to "deal with it later during voir dire." Voir dire resumed, and Plaintiffs' counsel clarified that the judge had not yet even decided to submit punitive damages to the jury and then asked if anyone had "strong feelings" about that. A venireperson responded:
So, I think-when it comes to over prescription of pain killers specifically, I think that's a much larger problem than just a civil court case in St. Louis. Personal experience, I've been deployed to Afghanistan, I've had friends that were put on pain medicine, graduate to heroin, kill themselves, things like that. I think it's a much larger problem than just one instance. I think this case is one of many cases throughout the United States where something like this happens. So, I am completely one-sided on that, where there isn't a monetary amount that you could put on this. This is something that's on a case-by-case basis on its case that there needs to be some sort of regulation or something just related to prescription pain pills.
Another venireperson agreed that "these narcotics have been overprescribed, and people are graduating to harder drugs, and it's turning into people selling pills and being addicted." Another said there is a "major problem" with prescription medicine today, though this was not entirely the prescribing doctors' fault. Discussion about the panel's opinions regarding patient responsibility and addiction then ensued.
The next morning, Defendants' counsel argued that, in light of the comments by venirepersons about the opioid epidemic, counsel's statement that punitive damages do not go to compensate the plaintiff may have confused the jury as to where that money does go. He speculated that perhaps they would be thinking that money might somehow fund regulations of opioids. He requested a mistrial, which was denied. The court pointed out that counsel was actually trying to prevent confusion with his answer about punitive damages and everyone had moved on to other issues.
On appeal, Defendants insist that by telling the inquisitive juror that punitive damages do not compensate the plaintiff, counsel "created the impression" and "encouraged the jury to speculate" that the money would go to fight the opioid epidemic. We disagree. By no stretch of the imagination did counsel's response to the venireperson's question imply that punitive damages would be used for this purpose or go anywhere in particular. To the contrary, he merely reiterated-correctly and without indicating that plaintiff would not receive any of those damages-that punitive damages were "not to compensate the plaintiff" and that he could not tell her "where they go." The comments by other panel members about the opioid epidemic had nothing to do with the purpose for or recipient of punitive damages; in fact, the first venireperson suggested money awarded in a particular case would not fix the wider problem and there needed to be regulations instead. The trial court did not abuse its discretion in denying the request for the drastic remedy of a mistrial under these circumstances. See generally Stucker v. Rose, 949 S.W.2d 235, 238 (Mo. App. S.D. 1997) ("necessity of the drastic remedy of mistrial rests in the sound discretion of the trial court, and absent a manifest abuse of that discretion, appellate courts will not interfere.")
*766 Submissible Case of Negligence
Defendants contend that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict, claiming that there was insufficient evidence to establish the requisite standard of care from which Defendants were alleged to have deviated and therefore Plaintiffs failed to make a submissible claim against Dr. Walden or SLU for negligence. Whether the plaintiff made a submissible case is a question of law we review de novo, viewing the evidence and all reasonable inference therefrom in the light most favorable to the jury's verdict to determine whether there was sufficient evidence as to each fact essential to liability. Drury v. Missouri Youth Soccer Association, Inc., 259 S.W.3d 558, 565 (Mo. App. E.D. 2008). We will reverse only if there is a complete absence of probative facts to support the jury's conclusion. Id.
Defendants' sole argument as to the submissibility of the claim against Dr. Walden is that the evidence about the standard of care was improperly based on information that came about after Koon's treatment and was not relevant in Missouri. In setting out the various standards of care relating to prescribing opioids, Dr. Genecin discussed the guidelines for dosing and other information from a 2016 CDC publication and from an interagency publication for the State of Washington. Those sources were, in Dr. Genecin's opinion, accurate reflections of the standards applicable to Dr. Walden during the relevant time frame in Missouri: the standards were "in existence and well known by the medical community" during the 2008 to 2012 time period and those were the standards "throughout the country." He also said those standards were reflected in many other sources as well. Thus, there was sufficient evidence about the standard of care applicable to Dr. Walden at the relevant time period, irrespective of the fact that some of the sources reflecting those standards were not published until after Koon's treatment or were not published for this state.
As to the submissibility of claims against SLU, SLU admitted-early in the pleadings and at trial-that Dr. Walden was its employee and acted within the course and scope of his employment when prescribing opioids to Koon. Thus, SLU was as a matter of law vicariously liable for everything Dr. Walden did to cause Koon's injuries. See Cluck v. Union Pacific Railroad Company, 367 S.W.3d 25, 29 (Mo. banc 2012) (where employer-employee relationship exists, doctrine of respondeat superior holds employer vicariously liable for injury-causing conduct of employee done within course and scope of employment). Because SLU conceded the application of respondent superior, Koon's recovery against SLU was certain as long as he could prove Dr. Walden's liability:
Once vicarious liability for negligence is admitted under respondeat superior, the person to whom negligence is imputed becomes strictly liable to the third party for damages attributable to the conduct of the person from whom negligence is imputed. The liability of the employer is fixed by the amount of liability of the employee.
Cole v. Warren County R-III School District, 23 S.W.3d 756, 761 (Mo. App. E.D. 2000) (citing McHaffie v. Bunch, 891 S.W.2d 822, 826 (Mo. banc 1995) ); see also Coomer v. Kansas City Royals Baseball Corporation, 437 S.W.3d 184, 206 (Mo. banc 2014) (where employer admitted vicarious liability, if its employee was found negligent for throwing hot dog at fan during ballgame, no other theory of liability would be "necessary or useful" to establish employer's responsibility for fan's injury).
*767 Nevertheless, Defendants maintain that Plaintiffs did not actually submit any claims based on vicarious liability and that the only basis for holding SLU liable for Koon's injuries was for its negligent supervision of Dr. Walden. They contend this is a theory of direct liability against SLU, which required evidence of a standard of care about supervision applicable to SLU, independent of any standard about the medical care itself applicable to Dr. Walden. Defendants contend this negligent supervision theory was the only basis submitted to the jury for holding SLU responsible for Koon's injuries. We disagree.
The verdict-director given to the jury for determining negligence-which is not challenged on appeal-did not submit a negligent supervision claim. Rather, it provided four alternative basis for finding Defendants liable for Koon's injuries: Dr. Walden and SLU either failed to weigh the risks and benefits of prescribing opioids to Koon, overprescribed opioids to Koon, failed to monitor Koon's opioid treatment or failed to assess Koon for dependency or addiction. There is no assertion in this instruction that SLU failed to supervise or monitor Dr. Walden. Thus, this is completely unlike the case Defendants cite involving negligent supervision of a resident physician by an attending physician. See Dine v. Williams, 830 S.W.2d 453, 456 (Mo. App. W.D. 1992). In that situation, a standard of care applicable to the supervision of the other physician-different than the standard for providing the medical care to the plaintiff-was required to make a submissible case for negligent supervision. See id. But here, the verdict-director was phrased entirely in terms of the medical care provided to Koon by both Dr. Walden and SLU.[5] Thus, to the extent any theories of direct liability were submitted against SLU here, they were based on its provision of medical care to Koon, not on its supervision of Dr. Walden. As such, no additional standard of care regarding supervision was required. Rather, the evidence relating to the standards for the medical care itself applied to SLU. We have already dealt with the only challenge to that standard relating to Dr. Genecin's sources, and there was more than sufficient evidence to establish the requisite standard applicable to healthcare providers when prescribing opioids.
There is no basis for this Court to conclude that SLU should have been directed out of this case or had a JNOV entered in its favor on liability due to the lack of standard of care evidence. Plaintiffs made a submissible case against SLU either on a theory that it was vicariously liable for Koon's injuries based on Dr. Walden's deviation from the standard of care or on a theory that it was directly liable for Koon's injures based on its own failure to meet the requisite standards for healthcare providers.
Admission of Expert Testimony
Defendants contend that the trial court erred in allowing Plaintiffs' expert, Dr. Genecin, to give his opinions about "the alleged deficiencies in SLU's supervision and monitoring of Dr. Walden" because he had not previously opined at all about SLU during his deposition. This claim of error is erroneously premised on the existence of a negligent supervision claim, which as discussed above was not actually the claim presented to the jury. In fact, the specific opinion challenged in this Point Relied On about SLU supervising Dr. Walden is not even given by Dr. Genecin anywhere in his testimony. In the eight pages of his testimony cited to by Defendants in the argument *768 portion of this point, Dr. Genecin gives opinions about the various ways Dr. Walden and SLU deviated from the standard of care, including their failure to monitor Koon's opioid treatment. As discussed above, failing to supervise the doctor is a different claim than failing to monitor the patient. Thus, the Point Relied On fails on its face because there can be no error in the admission of opinions that were not given. The other opinions cited within the argument portion of the brief-but not set forth as a erroneously admitted evidence in any point relied on-are not properly presented for appellate review and we will not consider them.[6] See Rule 84.04(e) ("The argument shall be limited to those errors included in the Point Relied On"); Rule 84.13(a) ("allegation of error not ... properly briefed shall not be considered").[7]
Punitive Damages Instruction
Defendants contend the trial court erred in giving the punitive damages instruction because the standard set forth therein conflicted with substantive law. We disagree.
Whether the jury was instructed properly is a question of law that we review de novo. City of Harrisonville v. McCall Service Stations, 495 S.W.3d 738, 746 (Mo. banc 2016). The appellant must show that the challenged instruction "misdirected, misled, or confused the jury, resulting in prejudice" to the appellant. Id. We reverse "only if the error resulted in prejudice that materially affects the merits of the action." Id.
The challenged instruction was based on the Missouri Approved Instruction 10.07, applicable to punitive damages in a negligence case. It stated that, first, if the jury found Defendants either failed to weigh the risks and benefits of prescribing opioids to Koon, overprescribed opioids to Koon, failed to monitor Koon's opioid treatment or failed to assess Koon for dependency or addiction, and
*769 Second, Defendants knew or had information from which Defendants, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and
Third, Defendants thereby showed complete indifference to or conscious disregard for the safety of others, then, in Verdict A, you may find that Defendants Dr. Henry Walden and Saint Louis University are liable for punitive damages.
Defendants challenge the italicized language, arguing that it is inconsistent with the standards for awarding punitive damages against a healthcare provider as set forth in Section 538.210.6:
Any provision of law or court rule to the contrary notwithstanding, an award of punitive damages against a healthcare provider governed by the provisions of sections 538.205 to 538.230 shall be made only upon a showing by a plaintiff that the healthcare provider demonstrated willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition. (emphasis added)
Defendants claim that "complete indifference or conscious disregard" is a lesser standard than "willful, wanton or malicious." Defendants argue that because the MAI and the statute conflict, the language in Section 538.210.6 governs and should have been used in the instruction. They also contend that because the statute is specific to medical negligence cases, whereas MAI 10.07 is generally applicable to any negligence action, the statute prevails over the MAI. They claim that when the statute was enacted, it was intended to change and preempt the law as set forth in the MAI for punitive damages against healthcare providers.
The use of an MAI instruction is mandatory where such instruction is applicable to the case. Goralnik v. United Fire and Casualty Company, 240 S.W.3d 203, 209 (Mo. App. E.D. 2007). "MAI instructions, promulgated and approved by the Supreme Court, are authoritative if applicable to the factual situation," and this Court, as well as the trial court, is bound by them. Id. (internal quotation marks and citations omitted). "To require that the trial court give a non-MAI instruction, a party has to prove that the MAI instruction submitted to the jury misstates the law." Id. Thus, when there is a conflict between an instruction and the substantive law, the substantive law must govern, and if a particular MAI does not state the substantive law accurately, then it should not be given. SKMDV Holdings, Inc. v. Green Jacobson, P.C. , 494 S.W.3d 537, 553-54 (Mo. App. E.D. 2016). Here, there is no actual conflict between the standard for awarding punitive damages as set forth in this instruction and the one set forth in Section 538.210.6 because we conclude, based on the case law below, that for purposes of punitive damages acting with "complete indifference or conscious disregard for the safety of others" is the legal equivalent of engaging in "willful, wanton or malicious misconduct."
The substantive law has long provided that to impose punitive damages in a negligence case, the negligent act must be done either with "such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted" or with "conscious negligence tantamount to intentional wrongdoing." Reel v. Consolidated Investment Company, 236 S.W. 43, 46 (Mo. 1921). Thus, punitive damages were allowed where the defendant is negligent but is "conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding *770 circumstances and existing conditions, that his conduct will naturally or probably result in injury." Id. ; see also Eoff v. Senter, 317 S.W.2d 666, 672 (Mo. App. 1958) (court of appeals approved punitive damage instruction in negligence case premised on defendant's "reckless and wanton disregard for the welfare and safety of the plaintiff"). Based on this case law, the Supreme Court in 1973 concluded that the MAI instruction allowing punitive damages if the defendant's conduct "showed complete indifference to or conscious disregard for the safety of others" was appropriate in a negligence case. See Sharp v. Robberson , 495 S.W.2d 394, 399 (Mo. banc 1973).[8]
In 1986, the legislature passed Section 538.210, which replaced common law medical malpractice claims with a statutory cause of action against healthcare providers. Among other things, the provisions therein limit the types and amounts of damages recoverable in these cases, As for punitive damages, there must be a showing that the healthcare provider demonstrated "willful, wanton or malicious misconduct," Section 538.210.6. There are approved instructions in the MAI specific to actions against healthcare providers, but none of them address punitive damages. See MAI 21.00, et seq. Thus, MAI 10.00 through 10.08 are the only approved instructions regarding exemplary damages.
There are very few reported cases regarding punitive damages against healthcare providers since the enactment of this statute, only one of which actually addresses the interplay of the statute and the MAI.[9] Dodson v. Ferrara was a wrongful death case based on medical negligence in which the trial court granted a directed verdict for the defendant on the plaintiff's punitive damages claim. 491 S.W.3d 542 (Mo. banc 2016). Because of the directed verdict, no instruction on punitive damages was ever given in that case, and instructional error was not an issue on appeal.
Nevertheless, in discussing the standards for punitive damages against a healthcare provider, the Supreme Court set out both the language contained in the statute and in the MAIs:
To make a submissible case for aggravating circumstances damages against healthcare providers in a medical negligence action, a plaintiff must show that the healthcare provider demonstrated "willful, wanton or malicious misconduct with respect to his actions *771 which are found to have injured or caused or contributed to cause the damages claimed in the petition." Section 538.210.5. Section 538.205(10) defines "punitive damages" as those intended to punish or deter willful, wanton or malicious misconduct, which includes exemplary damages and damages for aggravating circumstances, To support a claim for aggravating circumstances damages or for punitive damages, the plaintiff must present clear and convincing evidence at trial to support the claim.
Defendants correctly point out that damages for aggravating circumstances are not generally recoverable in negligence actions because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct. Nonetheless, both Missouri Approved Instruction (MAI) 10.02 and MAI 10.07 provide that punitive damages may be awarded for a negligent act or omission if the jury finds that the conduct of the defendant "showed complete indifference to or conscious disregard for the safety of others." MAI 6.02 states that the same showing is necessary for an award of aggravating circumstances damages in a wrongful death case when the theory of liability is negligence.[10]
Id. at 562-63 (emphasis added) (case citations and quotation marks omitted). The Court noted that the parties did not dispute the standards set out in those MAIs. See id. at 575, n. 13.
The Court proceeded to analyze the evidence, relying exclusively on the way the standard is set out in the MAI: "Plaintiffs failed to prove that [the doctor] acted with complete indifference to or a conscious disregard for the safety of others;" "Plaintiffs failed to make a submissible case demonstrating that [the doctor] acted with complete indifference to or conscious disregard for the safety of [the plaintiff];" "[The doctor's] conduct may have been negligent, but it did not show a conscious disregard for [the plaintiff's] safety;" defense conduct at trial may supply "the element of complete indifference or conscious disregard necessary to an award of aggravating circumstances damages." Id. at 563-64.
Defendants cite only to the first of the above-quoted paragraphs containing the Court's citation to the statute and omit the Court's discussion of the MAIs and the Court's reliance thereon throughout the remainder of the opinion. They insist that Dodson "affirms" their position that the statute conflicts with, and therefore preempts, the MAI and proves the instruction in this case was required to include the "willful, wanton and malicious" language. At oral argument, they claimed that because no one had argued in Dodson that the MAI language conflicted with the statute, the Court's use of language from the MAI is essentially dicta and encouraged us to ignore it.
Defendants mischaracterize the holding in Dodson and its precedential impact. Dodson actually refutes their claims that MAI 10.07 is not appropriate in a case against a healthcare provider. If the Court believed the MAIs were inapplicable to a case against a healthcare provider and the statute prevailed, it would not have used them. Rather than segue from the statutory standard to the MAI language with "nonetheless," the Court would have simply stopped after reciting the statutory *772 language. If the Court believed that the MAI language "complete indifference to or conscious disregard for the safety of others" was a lesser standard than was required under Section 538.210.6, it would not have relied on it in analyzing the evidence in a Section 538.210 case. By relying entirely on the "complete indifference and conscious disregard" language in that analysis, the Court indicated that it is an accurate statement of the substantive law. Because use of that language was an integral part of the Court's holding, it is not dicta; rather, it is precedential support for our conclusion that conduct that is completely indifferent to or in conscious disregard for the safety or rights of others is the legal equivalent of conduct that is willful, wanton and malicious for purposes of punitive damages.
These terms are so conceptually similar that they have-before and after promulgation of the MAIs and enactment of the statute-frequently been used interchangeably in myriad contexts, as the following language in italics, which we added for emphasis, indicates. For instance, in Evans v. Illinois Central Railroad , the Court stated that an act done in "conscious disregard of the life and bodily safety ... necessarily mean[s] that such act was intentionally done without regard to the rights of others, and in full realization of the probable results thereof." 289 Mo. 493, 233 S.W. 397, 400 (Mo. banc 1921). In State ex rel. Kurn v. Hughes , the Court examined whether the defendant had "maliciously, willfully, intentionally or recklessly injured the plaintiff" or had "such a conscious disregard of the rights of plaintiff as to amount to willful and intentional wrongdoing." 348 Mo. 177, 153 S.W.2d 46, 53 (1941). Likewise, a wanton mental state is "a knowing and conscious disregard of the right or the welfare of another." Ryburn v. General Heating & Cooling Company, 887 S.W.2d 604, 609 (Mo. App. W.D. 1994). In Meyer v. Purcell, this Court set out the standard for making a submissible case of punitive damages in a legal malpractice case, namely that the defendant's conduct "showed complete indifference to or a conscious disregard for [the plaintiff's] rights," which required proof that the defendant intentionally acted "either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." 405 S.W.3d 572, 575-76 (Mo. App. E.D. 2013) ; see also Smith v. Brown & Williamson Tobacco Corporation, 410 S.W.3d 623, 630-31 (Mo. banc 2013) (same). Other cases have said conduct that amounts to a conscious disregard for the safety of others so as to constitute recklessness "is the legal equivalent of willfulness." Porter v. Erickson Transport Corporation, 851 S.W.2d 725, 747-48 (Mo. App. S.D. 1993).
Because these words and phrases are essentially synonymous in this context, an act that is found to have been done with complete indifference to or with conscious disregard for the safety of others is also an act constituting willful, wanton or malicious misconduct. The words used in MAI 10.07 correctly set forth the substance of the applicable law in Section 538.210.6 and are not a misstatement of or in conflict with the law. See, e.g., State v. Julius, 453 S.W.3d 288, 301 (Mo. App. E.D. 2014) (use of phrase "was aware" in instruction instead of "knowing" as used in statute did not conflict with statute because statute defined "knowledge" as synonymous with "awareness"). Giving the punitive damages instruction in this case based on that MAI was not error.
Submissible Case of Punitive Damages
Defendants contend that the trial court erred in denying its motions for *773 directed verdict and judgment notwithstanding the verdict on the claims for punitive damages against Dr. Walden and SLU. There must be clear and convincing evidence in support of a claim for punitive damages in order to submit that claim to the jury. Rodriguez v. Suzuki Motor Corporation , 936 S.W.2d 104, 110 (Mo. banc 1996). This higher standard of proof has been said to require evidence that "instantly tilts the scales" in favor of punitive damages "when weighed against the evidence in opposition." Peters v. General Motors Corporation, 200 S.W.3d 1, 25 (Mo. App. W.D. 2006). Whether there is sufficient evidence to support the submission of punitive damages is a question of law which we review de novo. Meyer, 405 S.W.3d at 575.
As was instructed in this case, to impose punitive damages for negligent acts, there must be evidence that the defendant knew or had reason to know that there was a high degree of probability that his conduct would result in injury and thereby showed complete indifference to or conscious disregard for the safety of others. In this way, as discussed above, though he may have had "no specific intent to injure," the defendant's awareness-from his knowledge of surrounding circumstances-that his conduct would probably result in injury demonstrates that his actions were "tantamount to intentional wrongdoing." Reel, 236 S.W. at 46.
There was clear and convincing evidence in this case that Dr. Walden, though he had no specific intent to injure Koon, was well aware of the risks associated with the prescription of these unusually high amounts of opioids. His decision to prescribe increasingly higher doses over several years-without adequate discussions with Koon about the risks, without any monitoring system in place and despite the warning signs that Koon was dependent and possibly addicted-demonstrated a conscious disregard for Koon's safety and the safety of others. As Dr. Genecin said, Dr. Walden prescribed a colossal amount of opioids and put Koon at a very high risk of addiction. Besides the astronomical amount of opioids at issue, prescribing three different kinds of opioids to Koon at the same time and along with other sedatives was a "lethal combination," which further indicates Dr. Walden's complete indifference to Koon's safety.
Defendants argue that there was other evidence, however, of the factors that the Supreme Court has said "weigh against submission of punitive damages":
prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred.
Lopez v. Three Rivers Electric Co-op., Inc., 26 S.W.3d 151, 160 (Mo. banc 2000). They contend that the evidence shows that Dr. Walden was just trying to balance the "then-known" risks of prescribing opioids with Koon's desire to manage his pain so that he could continue working and that Dr. Walden's assessment of Koon's dependency, possible addiction or other adverse effects was compromised by the patient's failure to be more forthcoming about the ill-effect the drugs were having on his life. We disagree. To the extent there are mitigating factors in this case, the scales still instantly tip in favor of punitive damages.
First, Defendants assert there was no evidence of "prior similar incidents" because Dr. Walden had no history of other patients with complaints or injuries similar to Koon's from his opioid prescriptions. This is not surprising given the unusually *774 high dose Koon was taking and the fact that very few of Dr. Walden's other patients had ever been on doses of opioids as high as Koon's. Moreover, this factor goes to a defendant's knowledge, and Dr. Walden admitted he knew about the risks of prescribing this amount of opioids for this length of time and was nevertheless prescribing them during a prescription opioid epidemic, about which he was also admittedly fully aware. Therefore, the fact that this was the first of his patients to develop a problem does not supply the same mitigating weight that we would otherwise give to this factor.
Defendants next point out that Koon acknowledged he was not forthcoming with information to Dr. Walden about the issues he was having with the medication and that the jury recognized this contributed to Koon's problems by allocating 33% of the fault to him, which shows the injury was "unlikely to have occurred" without Koon's own negligence. Despite Koon's admission to withholding information, there was also evidence that he nevertheless exhibited signs of dependency and addiction: he regularly needed early refills, asked for higher doses and took more than the prescribed amount. And, as one expert explained, once addicted, a patient "cannot articulate the effect the increased doses of medications are having on their lives" and will continue taking the medicine despite their side effects. Therefore, even though Koon's own actions contributed to his injury, in this case that does not outweigh the evidence suggesting that Dr. Walden turned a blind eye to signs that Koon needed help.
Finally, Defendants contend there was no evidence that Dr. Walden violated any clear-standard or law by prescribing the amounts of opioids that he did. They contend evidence that the recommended daily maximum does of opioids was 120 milligrams MED was "undermined" by the "undisputed" evidence that one type of morphine-that was not prescribed to Koon-had an FDA-approved dose of 1,600 milligrams MED. We hardly think this outweighs the significantly clearer and more convincing evidence that at doses over 120 milligrams MED, the patient should be under the care of a pain management specialist. Even Dr. Walden agreed that was a good recommended upper limit in general. Defendants also contend that because the CDC guidelines on this issue and the letter to the FDA requesting a limit on the label were not published until 2012, the information about opioid risks and addiction was "still emerging" when Koon was being treated by Dr. Walden. The fact that these particular publications were not available at the time of treatment does not outweigh, undermine or actually even contradict evidence-including Defendants' own admission-that the risks of prescribing opioids were well known from 2008 to 2012. Moreover, even recognizing the maximum doses discussed at trial were generalized and not mandatory, that simply does not outweigh that the amount being prescribed here was extraordinarily high. Koon's average daily dose of opioids reached 1,555 milligrams MED, This was not merely higher than the suggested upper limit of 120 milligrams MED, it was much, much higher-13 times higher.
In short, the evidence shows that Dr. Walden knew or had information from which he should have known there was a high probability that prescribing Koon these amount of opioids for this length of time would result in injury. His decision to prescribe these amounts for this length of time was done in conscious disregard of, and with complete indifference to, Koon's safety and the safety of other. We find this to be tantamount to intentional wrongdoing.
*775 Plaintiffs made a submissible case of punitive damages against Dr. Walden.
As to the submissibility of the punitive damages claim against SLU, as we discussed earlier in the opinion, SLU admitted vicarious liability. When an employer concedes vicariously liability for the acts of its employee "all that is necessary to award punitive damages against the employer is ... that [the employee's] actions meet the level justifying an award of punitive damages." Flood ex rel. Oakley v. Holzwarth, 182 S.W.3d 673, 680 (Mo. App. S.D. 2005) (verdict form allowing for assessment of punitive damages against both employee and employer together was not erroneous). To the extent there was a claim directly against SLU separate and apart from its vicarious liability, it was based on its treatment of Koon and there was clear and convincing evidence that it too acted in conscious disregard for his safety. SLU's refusal to see a need for an opioid prescription monitoring system to keep account of the amounts of opioids being prescribed to its patients, even by the time of trial-when Defendants claim information about the risks of these drugs was more well-known-demonstrated SLU's complete indifference to the safety of those patients. There was a conscious decision on SLU's part to do nothing in the face of a known increased risk of addiction from opioids at higher dose levels. That SLU did not see an opioid problem in its ambulatory care practice does not justify this choice, at least not in the face of its admitted knowledge of the ongoing opioid epidemic in general. Under the circumstances of this case, SLU was either vicariously liable for Dr. Walden's punishable conduct or engaged in conduct itself that was tantamount to intentional wrongdoing. Either way, it was not error to submit punitive damages against either of these defendants in this case.
All points are denied. The judgment is affirmed.
Sherri B. Sullivan, J., concurs.
Kurt S. Odenwald, J., concurs in separate concurring opinion.

Other risks mentioned at trial include abuse (using the drugs to get high, not for pain relief), misuse (diverting prescription drugs for sate on the street) and sensitization (pain getting worse the longer the drug is used).

Because they all have different potencies, opioid doses are discussed by comparing their potency per milligram to that of morphine, referred to as the morphine equivalency dose or "MED."

The records and testimony sometimes referred to the brand names for hydrocodone, such as Vicodin and Lortab.

One of the cited pages contains testimony Defendants elicited themselves on direct examination about a letter to the FDA signed by Dr. Gunderson and other physicians, which described the increasing problem with prescribing opioids and was intended to get the FDA to change the labeling requirements for opioids. Defendants will not be heard to complain on appeal about testimony they elicited. On cross-examination, naturally, Plaintiffs asked Dr. Gunderson more about this letter, and he recited various statistics that were included therein: that a four-fold increase in prescribing opioids was associated with a four-fold increase in opioid-related overdose death and a six-fold increase in opioid addiction; that the increase in opioid prescriptions was in response to a campaign that minimized the risks and exaggerated the benefits of long-term opioid use; that long-term safety and effectiveness of managing chronic non-cancer pain with opioids had not been established; and many non-cancer patients on chronic opioid therapy continue to experience significant chronic pain and dysfunction. There was no objection to this line of questioning, and because Defendants invited discussion of this letter by asking about it on direct examination, we decline to consider a challenge to the admissibility of this testimony on appeal.

In addition to admitting it was Dr. Walden's employer, SLU also admitted that that it had accepted Koon as a patient for purposes of providing him medical care and treatment and that it did so provide such care and treatment through its physicians.

Ex gratia, we point out that, even if the admissibility of these opinions was properly presented for review, we would find no error. Dr. Genecin testified in his deposition that "everyone who is prescribing" opioids must have training and systems in place to ensure that patients are not overprescribed. At trial, Dr. Genecin was allowed to testify that the standard of care requires that "prescribing healthcare providers have a medication management system in place to make sure patients do not receive excessive or too much dosage of opioids." There is no argument on appeal that this particular testimony was inadmissible and it is clearly consistent with Dr. Genecin's deposition testimony. The fact that Dr. Genecin expanded on that general opinion and identified SLU's lack of a monitoring system, in particular and by name, was not different in any substantive way from his deposition testimony. Therefore, there was no "concealment and surprise" ground for precluding those opinions at trial. See Whitted v. Healthline Management, Inc., 90 S.W.3d 470, 475 (Mo. App. E.D. 2002). It was not an abuse of the trial court's discretion to admit it. See Eagan v. Duello, 173 S.W.3d 341, 346 (Mo. App. W.D. 2005) (trial court is vested with broad discretion as to course of action during trial when party challenges expert's testimony on ground that opinions changed since deposition). Likewise, Dr. Genecin's other opinions relating to how Dr. Walden "and SLU" breached the standard of care-even if they were "new" or "surprising"-could not have had a material effect on the outcome of the trial because regardless of SLU's conduct, it was vicariously liable as a matter of law for Dr. Walden's conduct. So, even if opinions about SLU's conduct were erroneously admitted, that would not require reversal. See Reese v. Brooks, 43 S.W.3d 415, 420 (Mo. App. E.D. 2001).

Plaintiffs' request to supplement the legal file with discovery materials they claim demonstrate that Defendants were not surprised by Dr. Genecin's opinions about SLU is denied. None of these materials were filed with the trial court, and they are not appropriate for inclusion in the legal file on appeal. See Rule 81.12(b).

The Court in Sharp was evaluating an instruction based on MAI 10.02, the companion to MAI 10.07, given here, for cases in which knowledge is already an element of liability. Both are appropriate for negligence cases and contain the language challenged here.

The first reported case appears to be Schroeder v. Lester Cox Medical Center, Inc., a wrongful death case based on a pharmacy's negligence, in which the appellant challenged the sufficiency of the evidence to support the punitive damages award under Section 538.210 and claimed error in the punitive damages instruction, which had required a finding that the defendant's conduct was "outrageous because of defendant's reckless indifference to the rights of others." 833 S.W.2d 411, 413 (Mo. App. S.D. 1992). The court did not address the merits of the instructional issue, however, because the error, if any, was invited. Id. at 425. Nevertheless, the court noted the "willful, wanton or malicious misconduct" standard in Section 538.210.6 and mentioned that some cases "equate recklessness with willfulness." Id. at 424. The next reported case is Dibrill v. Normandy Associates, Inc., in which this Court addressed how to plead punitive damages under Section 538.210.6. 383 S.W.3d 77, 91 (Mo. App. E.D. 2012). We found the petition sufficient in that case based on the allegations that the healthcare provider's acts were "willful, wanton, malicious and outrageous because of [their] reckless indifference to Plaintiff's rights and showed [their] complete indifference to or conscious disregard for Plaintiff's safety."

Aggravating circumstances are the equivalent of punitive damages when the injured party has died, and MAI 6.02 states that one of the exemplary damages instructions in MAI 10.00, et seq., must be selected when aggravating circumstances are submitted in a wrongful death case.