

# Missouri Court of Appeals

## Southern District

### Division One

JOHN HENRY RHODEN, and ) 
DOROTHY JEAN WINFIELD, )
                                          )
        Plaintiffs-Respondents, )
                                          )
        v.                               )       No. SD35898
                                          )
MISSOURI DELTA MEDICAL CENTER, )     **Filed: December 30, 2019**
                                          )
        Defendant-Appellant.      )

### APPEAL FROM THE CIRCUIT COURT OF SCOTT COUNTY

Honorable David A. Dolan, Circuit Judge

**<u>AFFIRMED</u>**

Missouri Delta Medical Center ("Appellant") brings this appeal from a jury verdict in a wrongful death case. We find no error and affirm the judgment.

In the light most favorable to the verdict, the evidence relevant to the points relied on includes the following: Mr. Rhoden, the deceased, had prostate issues for several years. He was treated by physicians in Missouri Delta Medical Center, including Dr. Killion and Dr. Rankin. At some point, Mr. Rhoden developed urinary complaints; he felt that his urine force was not as strong as he would like and he felt like he could not completely empty his bladder. Mr. Rhoden was not in need of emergency surgery, was

1

able to urinate without pain and had no problems with incontinence or post-void dribbling. Dr. Killion recommended an increase in the current medication prescribed to Mr. Rhoden; however, Dr. Killion did not recommend waiting to see if the increase in medication would work or if another medication would work, but instead scheduled surgery, telling Mr. Rhoden his two choices were surgery or self-administering a catheter for the rest of his life. Mr. Rhoden had other health issues, including being an insulin-dependent diabetic, obese and hypertensive, all of which increased the risk of surgery. Plaintiff's expert testified that given Mr. Rhoden's history, he was a high-risk candidate for surgery.

Dr. Killion admitted that it would have been acceptable to wait to see if the increase in medication would work given that Mr. Rhoden was a high risk candidate for surgery. Dr. Killion did not recommend alternatives such as: transurethral microwave treatment, a procedure that did not require surgery; other medications; or doing nothing for such minor symptoms. Appellant's own expert agreed that Mr. Rhoden's symptoms did not show a surgical emergency and that there were other medically acceptable options. Dr. Killion performed a transuretheral resection of the prostate ("TURP") and a transurethral incision of the bladder neck ("TUIBN"). Suffice it to say, the necessity and outcome of the surgeries, the subsequent treatment and lack of treatment, and the death of Mr. Rhoden provide the issues that are the subject of this appeal.

For ease of discussion, we begin with Point II.

### Point II

Appellant claims in its second point that the court erred in submitting Instruction No. 11 for aggravating circumstances damages because it misstated the law for punitive

2

damages. Appellant argues that section 538.210.8, RSMo,[1] provides the standard as "willful, wanton or malicious" and not "complete indifference to or conscious disregard for the safety of others." Respondent contends that Appellant has not preserved its claim in its second point. At trial, Appellant objected, "Judge, I object to the submission of punitive damages or aggravating circumstance and particularly with the standard of conscious disregard to the jury." Clearly, that vague statement did not preserve the objection for appeal.

Rule 70.03 provides that Appellant must register a specific objection to the verdict director. *Edwards v. Gerstein*, 363 S.W.3d 155, 170 (Mo.App. W.D. 2012). The rule states in part: "Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds of the objection." Rule 70.03. The purpose of that rule is that it allows the trial court to "make an informed ruling on the validity of the objection." *Berra v. Danter*, 299 S.W.3d 690, 702 (Mo.App. E.D. 2009).

Appellant, however, claims that the lengthy discussions with the trial court regarding the proper standard in the verdict director was preserved because the trial court and the parties were well aware of Appellant's objection to the verdict director. A review of the discussions during the instruction conference does indicate that the court and the attorneys were well aware of the discussion regarding the appropriate standard for punitive damages. We will address the merits of Point II.

There is no question that the court used the appropriate instruction from MAI,

---

[1] We note that the current version of section 538.210.8, RSMo Cum.Supp. 2017, was previously denominated as section 538.210.5 at the time of Mr. Rhoden's death in 2013, and became section 538.210.6 in a subsequent amendment in 2015.

MAI 10.07. The instruction provided that Appellant was liable for damages for aggravating circumstances if Appellant showed "complete indifference to or conscious disregard for the safety" of Mr. Rhoden. Appellant contended at trial and to this Court that the proper standard for aggravating circumstances should be taken from section 538.210.8, which is that Appellant would be liable for aggravating circumstances damages if Appellant showed "willful, wanton or malicious" conduct.

Appellant argues that the trial court should have recognized "that, despite the language of MAI 10.07 and the holding in *Koon*, the statutory language prevails over the MAI." *See Koon v. Walden*, 539 S.W.3d 752 (Mo.App. E.D. 2017). Appellant's contention that section 538.210.8 controls is not supported by any case law. The exact argument that Appellant is making here was made in **Koon**. In its well-reasoned opinion, the appellate court held:

> Because these words and phrases are essentially synonymous in this context, an act that is found to have been done with complete indifference to or with conscious disregard for the safety of others is also an act constituting willful, wanton or malicious misconduct. The words used in MAI 10.07 correctly set forth the substance of the applicable law in Section 538.210.6 and are not a misstatement of or in conflict with the law.

*Id.* at 772; *see also* **Bell v. Redjal**, 569 S.W.3d 70, 89 (Mo.App. E.D. 2019) ("For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others."). The trial court did not err in using the punitive damages instruction as set forth in this case based on MAI 10.07. Point II is denied.

## Point I

Appellant claims the trial court erred in submitting aggravating circumstances

damages to the jury and in denying Appellant's motion for directed verdict and motion for JNOV because the claim for additional damages was not supported by clear and convincing evidence that the health care providers demonstrated willful, wanton or malicious conduct.[2]  Respondents respond that Appellant's first point was not preserved because it did not raise the claim in a motion for directed verdict at the close of all the evidence.

To preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence. ***Browning v. Salem Memorial Dist. Hosp.***, 808 S.W.2d 943, 949 (Mo.App. S.D. 1991).  "A motion for a directed verdict shall state the specific grounds therefor." Rule 72.01(a).[3]  Failure to move for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to make a submissible case. ***Browning***, 808 S.W.2d at 949.  Similarly, a motion for directed verdict that does not comply with the requirements of Rule 72.01(a) neither presents a basis for relief in the trial court nor preserves the issue in the appellate court. ***Dierker Assoc., D.C., P.C. v. Gillis***, 859 S.W.2d 737, 742-43 (Mo.App. E.D. 1993).

Appellant raised twenty-two purported grounds for a directed verdict in a written motion.  Appellant did not preserve the issue in writing.  Appellant makes its claim via an oral request during the trial.  After filing the directed verdict motion at trial, Appellant stated:

---

[2] If Appellant is claiming an instructional challenge in this point, it is a separate issue from a substantial evidence challenge. ***Wieland v. Owner-Operator Services, Inc.***, 540 S.W.3d 845, 850 n.3 (Mo. banc 2018).  Because the argument section of the brief addresses a substantial evidence challenge, we address that issue.

[3] All rule references are to Missouri Court Rules (2019).

> I would like to specifically argue and point out that there is no submissible case whatsoever on the issue of punitive damages or aggravating circumstances. I don't believe there has been any evidence adduced whatsoever this [sic] rises to the level of an aggravating circumstances [sic].
>
> In addition, since this is a medical malpractice case it comes under Chapter 538, even though it is wrongful death, and as such this is a completely different standard for aggravating circumstances or punitive damages than there is in a regular civil tort case.

There are virtually no other statements by Appellant's counsel. Generally, a claim for directed verdict on partial damages that does "not identify evidence related to damages as an issue on which [Appellant] is entitled to a directed verdict" presents no basis for relief. *Trimble v. Pracna*, 51 S.W.3d 481, 502 (Mo.App. S.D. 2001).

Although it appears the "oral" motion has little specificity to pass muster with Rule 72.01(a), case law indicates that the bar is set low for a motion for directed verdict. *See Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, No. SC96528, 2019 WL 6710292, *3 (Mo. banc Dec. 10, 2019) ("The Rule 72.01(a) standard, however, is not a demanding one."). Therefore, we will address the merits of Appellant's motion for a directed verdict.

In the light most favorable to the verdict, the evidence shows a complete indifference to or a conscious disregard for the safety of Mr. Rhoden. Initially, when Mr. Rhoden presented with mild prostate issues, Dr. Killion proceeded with the highest risk option of surgery. Dr. Killion admitted Mr. Rhoden did not have painful urination, no incontinence, and was not in an emergency situation. It was also clear that Mr. Rhoden was a high risk candidate for surgery with multiple medical issues. Dr. Killion did not wait to see if the prescribed medication resolved Mr. Rhoden's issues. Dr. Killion presented to Mr. Rhoden a choice of immediate surgery (TURP) or catheterization every

6

day for the rest of Mr. Rhoden's life. Clearly, the evidence indicates those were not Mr. Rhoden's only two choices.

Dr. Killion committed common law negligence when he re-sected too much of the prostate and created a "shelf." To remedy the creation of the shelf, Dr. Killion conducted additional surgery (TUIBN), even though he knew it increased the risk of bladder perforation. This was exactly the wrong thing to do and breached the standard of care, again common law negligence. Dr. Killion should have left the resection alone and not gone deeper, and used either a curved catheter, called a coude catheter, or a catheter guide to make sure the catheter went into the bladder and not through the area weakened by resecting too much tissue. The TUIBN created a path for the catheter to follow but weakened the area of the bladder neck by resecting tissue, allowing the catheter to go outside the bladder and into the retroperitoneal area.

After breaching the standard of care, it was what occurred after the surgeries that constitutes aggravating circumstances. The evidence was clear that abdominal pain is out of the norm after a TURP surgery. Almost immediately after the surgery, Mr. Rhoden was in tremendous abdominal pain, and received morphine. The first note from the nurse indicated severe abdominal pain, 9 out of 10, which required morphine. The existence of immediate abdominal pain is an indication that something went wrong during the surgery and must be investigated.

Mr. Rhoden's condition deteriorated significantly after the surgery and before the October 18 exploratory laparotomy. By October 17, the day after the surgery, he was seriously ill, with severe abdominal pain, elevated heart rate, difficulty breathing and a creatinine rate which had tripled, indicating acute kidney failure. His kidneys failed, he

7

required assistance breathing and showed signs of sepsis. By October 18, Mr. Rhoden's family was told he would die unless he had surgery, a prognosis with which Dr. Killion agreed. All of these symptoms were caused by the negligence of Dr. Killion with the catheter being misplaced outside the bladder. After the surgery, Dr. Killion did no investigation into Mr. Rhoden's condition. He appeared oblivious to Mr. Rhoden's condition. Instead, Dr. Killion asserted in his notes that Mr. Rhoden tolerated his TURP surgery from October 16 very well.

Drs. Killion and Rankin did not investigate whether the TURP surgery was properly performed and was the cause of Mr. Rhoden's post-operative problems. By the morning of October 18, Mr. Rhoden was in major organ failure. He had an acute kidney injury that required dialysis and was in respiratory distress that would require a ventilator. The idea that the procedure was done incorrectly is the first concern (Dictum #1) when there is a problem with a patient post-surgery. Drs. Killion and Rankin ignored that possibility.

Dr. Killion admitted that Dictum 1 applies, and agreed that a physician has to consider the possibility that something went wrong during surgery. But neither he nor Dr. Rankin ran any of the tests to determine whether the bladder was perforated in the course of the TURP or whether the catheter was outside of the bladder. At that point in time, the damages from the negligence could have been minimized.

Both Dr. Killion and Dr. Rankin ignored the warnings of the hospital's radiologist that Mr. Rhoden's condition was likely caused by the TURP surgery. By the morning of October 18, 2012, Mr. Rhoden was in critical condition, suffering from multi-organ failure. A nephrologist treating Mr. Rhoden for his acute kidney failure, scheduled him

8

for x-rays of the chest and abdomen. The x-ray of the abdomen showed the presence of free air which the radiologist said was "likely post-surgical in nature." The x-ray of the chest showed the presence of free air under the right hemidiaphragm which the radiologist said "may be post-surgical in nature." This latter finding was so significant that the hospital's radiologist took the unusual step of calling Dr. Killion at 10:25 a.m. to communicate the results orally because the presence of free air in the hemi-diaphragm is a medical emergency. Dr. Rankin admitted that the radiologist may well have known of the TURP surgery as that history should be given when requesting the x-rays. Despite the radiologist's warning, neither Dr. Killion nor Dr. Rankin took any steps to determine whether the TURP surgery was properly performed and was the cause of Mr. Rhoden's catastrophic post-operative course. There were a number of actions that would have shown whether the catheter was misplaced.

Drs. Killion and Rankin ignored the further warning by Dr. Said that Mr. Rhoden had a urine leak caused by a perforated bladder. This was the second physician who told Dr. Killion that Mr. Rhoden's condition was related to a problem with the surgery, and Dr. Said specifically tied Mr. Rhoden's condition to a perforated bladder. Dr. Killion knew that Mr. Rhoden had suffered acute kidney failure immediately after the TURP surgery, and that this was consistent with a bladder perforation. Dr. Said's concern was related to a perforation of the bladder and that a CT scan of the abdomen and pelvis or a renal and pelvic ultrasound would have shown whether the bladder was perforated and the catheter was outside the bladder.

Dr. Said was met with rejection of any possibility that he (Dr. Killion) could have made a mistake during the surgery. Dr. Killion simply told Dr. Said that his surgery did

9

not cause a urine leak. Dr. Killion admitted he did not even consider the possibility of a bladder perforation despite the warning from Dr. Said. Dr. Rankin agreed that Dr. Killion's assertion that he didn't perforate the bladder is not enough—a physician must run tests such as a CT scan or a cystogram. A patient was severely ill, two fellow physicians raised direct concerns that the surgery Dr. Killion performed was causing Mr. Rhoden's problems, but Dr. Killion refused to conduct any tests to determine whether he had made a surgical error. Mr. Rhoden's condition worsened each day as the longer the catheter remained misplaced, the greater the damage. Dr. Killion admitted he had been told by the radiologist at 10:25 a.m. on October 18 that free air was found under the right hemidiaphragm. He knew it was serious finding and required immediate treatment.

As the retroperitoneal ultrasound taken at SLU Hospital on November 7 did show the catheter outside the bladder, if the same test had been conducted on October 18 it would also have shown whether the catheter was outside the bladder. In terms of evidence of conscious disregard of Mr. Rhoden's safety, the outright refusal to run tests to rule out the TURP surgery as the source of Mr. Rhoden's catastrophic post-operative course strongly supports the submissibility of aggravating circumstances damages.

The medical records show that Dr. Killion never contacted the radiologist Dr. Rankin to ask for the consult. A different physician, Dr. Said (not Dr. Killion), called for a surgical consult. The consult was not completed until more than six hours after Dr. Killion was advised of the emergency situation.

Dr. Killion had many opportunities to "right" the medical negligence with different types of tests. A phone call to the technicians and the test could have been expanded to include the retroperitoneal area which would have shown the catheter was

10

outside the bladder. It would only require moving the ultrasound machine 12-14 inches to include the retroperioneal area. Dr. Killion agreed that a technician could have easily examined the bladder area at this time and it would have taken only a couple of minutes. Had a retroperitoneal ultrasound been conducted on October 17, it would have shown the catheter outside the bladder. Dr. Killion and Dr. Rankin both admitted a retroperitoneal ultrasound would have shown if the catheter was outside the bladder.

Additionally, Dr. Rankin's failure to read the chart and know of Dr. Said's concern about the urine leak caused by a bladder perforation shows conscious disregard for Mr. Rhoden's safety. Any of the three tests (retroperitoneal ultrasound, cystogram or CT scan of the abdomen and pelvis) would have shown the catheter outside the bladder. Dr. Rankin further admitted that if he had known of Dr. Said's concern regarding a urine leak, he could have checked during the course of surgery. One of the tests he could have run was to inject methylene blue dye directly into the catheter and followed the dye to see if it was leaking out of the bladder, as it would in the event of a perforation.

Had Dr. Rankin run any of the tests to determine whether the bladder was perforated and the catheter was outside the bladder before conducting surgery, it is likely that surgery would not have been necessary.[4] The catheter could have been repositioned inside the bladder without surgery, just as a urology resident at SLU Hospital did after the testing revealed the catheter was outside the bladder. Had the catheter been discovered outside the bladder and properly placed, it is more likely than not that Mr. Rhoden would have healed without significant problems. Each day the catheter was permitted to remain

---

[4] Appellant claims that the laparotomy would have been conducted even if the misplacement of the catheter had been discovered before surgery. In assessing the submissibility of aggravating circumstances damages, Dr. Vitale's assertion that surgery would have been unnecessary is binding, while Appellant's contrary argument is to be disregarded.

outside the bladder, the more damage it caused.

Dr. Killion's assertion that Mr. Rhoden was having "a little bit" of other problems after the laparotomy is also indicative of a lack of care, considering that Mr. Rhoden was on a ventilator and in the throes of sepsis among other issues. After being transferred to SLU hospital, within hours Mr. Rhoden's condition improved; however, the havoc caused by the onslaught of renal failure, breathing failure requiring long term ventilator support and a tracheostomy, sepsis, fungemia and stroke was too much to overcome.

In *Koon v. Walden*, 539 S.W.3d 752, 772 (Mo.App. E.D. 2017), the Court of Appeals discussed the submissibility of a punitive damages claim under this standard in a medical malpractice case:

> [T]o impose punitive damages for negligent acts, there must be evidence that **the defendant knew or had reason to know that there was a high degree of probability that his conduct would result in injury and thereby showed complete indifference to or conscious disregard for the safety of others.** In this way, as discussed above, though he may have had no specific intent to injure, **the defendant's awareness—from his knowledge of surrounding circumstances—that his conduct would probably result in injury demonstrates that his actions were tantamount to intentional wrongdoing.**

*Id.* at 773-774 (emphasis added; internal quotations and citations omitted).

Here, substantial evidence was presented that both Dr. Rankin and Dr. Killion failed to order tests that would determine whether Mr. Rhoden's bladder was perforated during the TURP, either before or after the exploratory laparatomy performed by Dr. Rankin, despite being warned by a radiologist that Mr. Rhoden's condition was likely related to his TURP surgery and being further warned by Mr. Rhoden's nephrologist that Mr. Rhoden had a urine leak caused by a perforated bladder. Rather than investigate, either before or after surgery, the hospital's physicians did nothing even though they

knew Mr. Rhoden's condition continued to deteriorate dramatically and a bladder perforation was ruled out on the bare assertion by Dr. Killion that he would not have done that. Appellant's proof of conscious disregard was clear and convincing and more than met the applicable legal standard.

Point I is denied.

Point III

In its third point, Appellant claims the trial court erred in submitting Verdicts A and B to the jury and denying the motion for directed verdict and for JNOV because Respondents failed to submit evidence that the alleged negligence of the doctors caused Mr. Rhoden's death. In analyzing whether Respondents made a submissible case, we consider only the evidence in the light most favorable to Respondents and disregard all contrary evidence. *Johnson v. Auto Handling Corporation*, 523 S.W.3d 452, 459-60 (Mo. banc 2017); *Davolt v. Highland*, 119 S.W.3d 118, 123-24 (Mo.App. W.D. 2003).

Despite correctly stating our standard of review, Appellant argues its evidence was more persuasive than Respondents' evidence. Even after admitting that Respondents provided expert testimony of Dr. Garber that the breaches in the standard of care by the actions of Appellant caused or contributed to cause the significant postoperative problems and death of Mr. Rhoden, Appellant faults Respondents for not addressing the possibility that the pre-surgery conditions of Mr. Rhoden were "equally likely to have caused his death." The problem with that logic is that Respondents did not claim that the pre-surgery conditions were just as likely to have caused the death of Mr. Rhoden. It is Appellant who makes that contention with the testimony of its experts. The jury was free to assess the credibility of all the experts and chose to believe Respondents' experts.

13

Respondents presented evidence that to a reasonable degree of medical certainty, the breaches of the standard of care caused Mr. Rhoden's subsequent physical and mental deterioration and ultimate death. Point III is denied.

Point IV

Appellant claims in its fourth point that the trial court erred in permitting Respondents' expert, Dr. Vitale, to testify at trial because he was not a qualified expert. Appellant claims that a qualified expert, in accordance with section 538.225, must be actively practicing or within five years of retirement from the practice of medicine. Prior to addressing Appellant's point, we must determine if its objections to the qualifications of Dr. Vitale were properly preserved. Appellant filed a motion in limine to prevent Dr. Vitale's testimony on the basis that Dr. Vitale did not meet the qualifications of the healthcare affidavit statute. Despite having filed a "Motion in Limine to Strike the Testimony of Dr. Vitale against Dr. Killion and Dr. Rankin," the first objection made by Appellant came in response to the following question:

> [Respondents' counsel]: Do you have an opinion what the cause of that fluid collection was?
>
>  . . . .
>
> [Appellant's counsel]: Your Honor, I would like to renew my objection from the original Motion in Limine.
>
> The Court: Which number was that?
>
> [Appellant's counsel]: On the qualification.
>
> The Court: I will overrule the objection. Go ahead, sir.

Appellant filed the general motions in limine in one document and another entitled the Motion to Strike the Testimony of Dr. Vitale. Despite being requested by the

14

court to reference which motion in limine Appellant was referring to, Appellant's counsel simply stated the one on the "qualification." Appellant's general motion in limine, with 13 numbered subsections, included the following sub points:

- "[Respondents] should be precluded from presenting evidence regarding any allegations of negligence referenced in [Respondents'] petition which have not been supported by evidence consisting of expert medical witness testimony."
- "[Respondents'] expert witnesses should be precluded from offering any testimony based on personal opinion or personal standard as unrelated to facts of the case."
- "[Respondents'] expert witnesses should be precluded from offering any testimony which is not based on a reasonable degree of medical certainty."

There is simply no way that the court can be convicted of error in failing to discern which of the motions in limine Appellant was referring to when Appellant objected on the basis of "on the qualification."

Following the first objection, Appellant did not further object to Dr. Vitale's causation opinions. Appellant's counsel did not object again until Respondent's counsel stated, "Doctor, these are going to be so-called standard of care questions I am going to be asking you now." The objection was, "I would like to renew my Motion in Limine objection from pretrial." No further explanation was given by Appellant regarding the objection. It is without question that a motion in limine is an interlocutory ruling. *Rosales v. Benjamin Equestrian Center, LLC*, No. WD 82485, 2019 WL 6314788, *13 (Mo.App. W.D. Nov. 26, 2019). Appellant argues that once the court overruled the first objection Appellant clearly and timely objected to Dr. Vitale's opinion testimony on both causation and standard of care on the basis that he was not qualified to render such opinions. We disagree. The failure of a party to object to inadmissible evidence at the earliest possible moment waives any claim of error from the admission of that evidence.

15

*See Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993) ("By failing to object, plaintiff has waived any objection; nothing is preserved on this issue."). All of the testimony regarding causation was waived by the failure to properly object.

Likewise, the general objection referring to a "motion in limine from pretrial" preserves nothing for appellate review. Appellant directs us to nothing to support his position that the trial court understood on what basis Appellant was making an objection to the testimony of Dr. Vitale. Point IV is denied.[5]

<u>Point V</u>

Appellant contends in Point V that portions of the testimony from Respondents' expert witness, Dr. Garber, should not have been excluded. Specifically, Appellant claims that Dr. Garber's testimony should have been admitted:

> Q. Sure. I now want to talk to you about your causation opinions. If the surgery, the TURP surgery had never occurred do you know when Mr. Rhoden would have died?
>
> A. Unfortunately, I don't.
>
>    . . . .
>
> Q. Just so I can move on. You believe more likely than not if Mr. Rhoden had not had the TURP surgery he would not have died when he died? But you're not able to say how much longer he would have lived? Is that a fair statement?
>
> A: I think that is a fair statement. Yes.

We review the trial court's evidentiary rulings for an abuse of discretion. ***Kivland v. Columbia Orthopaedic Group, LLP***, 331 S.W.3d 299, 311 (Mo. banc 2011). Appellant correctly argues that Respondents had the obligation to prove that Appellant's negligence

---

[5] We note the trial court was directed in post-trial motions to ***Klotz v. St. Anthony's Med. Ctr.***, 311 S.W.3d 752 (Mo. banc 2010). ***Klotz*** directly held that section 538.225 did not govern the admissibility of expert testimony at trial but rather was a condition to the filing of a malpractice action against a health care provider. *Id.* at 760-61.

caused Mr. Rhoden to die when he did. This point relied on does not address the evidence used to support that obligation of Respondents. Instead, the questions asked of Dr. Garber and refused by the trial court address the speculative question of how long Mr. Rhoden would live absent any negligence on the part of Appellant. To be clear, the question was not about average life expectancy or a prognosis of a certain illness. The question asked of Dr. Garber was "[D]o you know when Mr. Rhoden would have died?" Appellant has cited no Missouri cases that found error in the exclusion of such a question. We cannot fathom how any physician could state with reasonable medical certainty the exact date when any person will die, much less someone with serious medical conditions. There is no abuse of discretion in denying the admission of the question and answer. The trial court did not err in excluding these questions to Dr. Garber. Point V is denied.

## Point VI

In its final point, Appellant claims error in allowing Respondents' counsel to comment on Appellant's dis-endorsed expert witness Dr. Schoenberg during voir dire and to read into evidence a part of Dr. Schoenberg's deposition wherein he stated the amount of money he had been paid in this case. First, we note that allowing comments during voir dire and the admission of evidence are two separate complaints of trial court error. There are two separate standards of review and separate case law supporting each of the claims of error. In its argument section and its facts, Appellant appears to address the reading of a deposition at trial. Appellant uses an abuse of discretion as the standard of review for the admission or exclusion of evidence. Therefore, we will address what appears to be a complaint about the admission of evidence at trial.

Once again, we must address the relief requested in the motion in limine and at

17

trial.  The motion in limine asked the court to prohibit Respondents from introducing evidence and/or arguing at trial an "adverse inference that Defendant failed to call Dr. Schoenberg at trial or from introducing testimony, evidence or argument that Defendant retained Dr. Schoenberg."  Counsel for Respondents stated while discussing the experts in the case during voir dire:

> Dr. Garber was paid for his work as an expert, about $25,000.  Dr. Price has been paid about $4,000.00 to date.  Dr. Salzman, he is paid.  He gets paid about $150,000 a year for medical-legal work.  Dr. Price gets about $5,000 a day.  And Dr. Hatcher gets about $5,000 a day.  And then this Dr. Schoenberg, one of their experts, was paid $30,000—[.]

Appellant objected that this was a "dis-endorsed" witness and that you could not make an adverse inference about such a witness.  Respondents claimed that the information was relevant to rebut the inference made by Appellant that Respondents' expert was charging the exorbitant sum of $26,000.  The court overruled the objection to that particular question being asked, but would not allow an adverse inference to be argued by Respondents from the failure of Appellant to call Dr. Schoenberg.  When voir dire resumed, counsel for Respondents then reiterated that one of Appellant's experts was paid $30,000.  The trial court subsequently allowed a question and answer from the deposition to be read during trial about the compensation received by Dr. Schoenberg.

 "Trial courts have broad discretion over the admissibility of evidence, and appellate courts will not interfere with those decisions unless there is a clear showing of abuse of discretion."  *Klotz*, 311 S.W.3d at 770.

> This standard gives the trial court "broad leeway in choosing to admit evidence," and its exercise of discretion will not be disturbed unless it "'is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.'" *State v. Freeman*, 269 S.W.3d 422, 426–27 (Mo. banc 2008), *quoting*, *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). In part, such broad leeway is granted to ensure the

18

probative value of admitted evidence outweighs any unfair prejudice. *Freeman*, 269 S.W.3d at 427, *quoting*, *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). "For evidentiary error to cause reversal, prejudice must be demonstrated." *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009).

***Mitchell v. Kardesch***, 313 S.W.3d 667, 674-75 (Mo. banc 2010).

Respondents argue that no adverse inference argument was made to the jury and the question simply informed the jury about the costs of experts for this type of matter. Appellant argues that an adverse inference was raised by simply stating the amount that Dr. Schoenberg charged. Without addressing whether it was error or fair rebuttal to a claim of exorbitant fees by Respondents' experts to admit evidence of the charges of a dis-endorsed witness, we find no prejudice to Appellant in the admission of the evidence. In a four-day trial, spanning almost 800 pages of testimony, a single reference to how much one expert charged was not prejudicial to Appellant. Point VI is denied.

The judgment is affirmed.

Nancy Steffen Rahmeyer, J. – Opinion Author

Gary W. Lynch, P.J., – Concurs

William W. Francis, Jr., J., – Concurs