

# Missouri Court of Appeals
## Southern District

### In Division

GREGORY FROST, )
)
          Respondent, )
)  No. SD37969
   vs. )
)  FILED: July 10, 2024
PCRMC MEDICAL GROUP, INC., )
D/B/A PHELPS HEALTH MEDICAL GROUP, )
)
          Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable William Earl Hickle, Judge

### AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH DIRECTIONS

Gregory Frost ("Frost") claimed he became addicted to opioids due to the negligence of

PCRMC Medical Group, Inc., d/b/a Phelps Health Medical Group ("Medical Group").[1]  A jury

found that Frost incurred compensatory damages in the amount of $200,000, that comparative

fault for said damages was ninety percent attributable to Frost and ten percent attributable to

Medical Group, and that Medical Group was liable for $500,000 in punitive damages.  On

appeal, Medical Group raises six points asserting that Frost's negligence claim was partially

---

[1] This opinion will discuss opioid medications—including oxycodone and fentanyl—and dosages of such medications in detail.  Because there is a range of opioid medications, each with varying properties and potencies, a uniform way to measure a dosage of any particular opioid is to compare its potency to milligrams of morphine, otherwise referred to as morphine milligram equivalents ("MME") or morphine equivalent daily doses ("MED").

foreclosed by the statute of limitations (point 1), the negligence verdict director allowed for a roving commission (point 2), the punitive damages verdict director was not supported by clear and convincing evidence (point 3), the resulting punitive damages award violated due process (point 4), and certain exhibits admitted into evidence were inadmissible hearsay (points 5 and 6). We affirm in part, reverse in part, and remand with directions.

## Factual and Procedural Background

Frost suffers from chronic pain syndrome resulting from trauma he sustained in a 2002 motorcycle accident. For eight-to-nine years, prior to any involvement by Medical Group in Frost's treatment, Frost received a low dose opioid medication regimen consisting of thirty-to-forty-five MME of oxycodone per day to treat his pain.

In July of 2011, a Medical Group physician, Dr. Bohdan Lebedowicz provided Frost emergency treatment, prescribing him a thirty-day supply of Endocet (a combination of oxycodone and Tylenol), at a dosage of thirty MME, for his chronic pain. Dr. Lebedowicz also referred Frost to a pain specialist, but Frost did not follow up with this referral until almost two years later.

Dr. Lebedowicz, thereafter, began serving as Frost's primary care physician and, over the next couple of years, increased Frost's opioid regimen several times. In February of 2012, Dr. Lebedowicz increased Frost's oxycodone dosage to 45 MME per day after Frost complained he had injured his back. Then, in June of 2012, Frost complained that his pain was "much worse" following a road trip to Florida, and Dr. Lebedowicz added Duragesic (a fentanyl patch) to the regimen, resulting in a total opioid dosage of 105 MME per day. A sleep study that Dr. Lebedowicz ordered around this time reflected that Frost had reported he had used illicit narcotics, such as heroin or cocaine, in the past. Frost continued to complain of uncontrolled

2

shoulder, leg, and back pain, and, in response, Dr. Lebedowicz doubled the dosage of the fentanyl patch in February of 2013 and again in April of 2013, resulting in a total opioid dosage of 185 MME per day.

Frost's opioid prescriptions remained unchanged for the next seventeen months. In May of 2013, Frost followed up with the July 2011 referral by Dr. Lebedowicz to a pain specialist. In the report following that consultation, a copy of which Dr. Lebedowicz received, the pain specialist noted the following:

> [Frost] will keep his pain medications with Dr. Lebedowicz as he is on high doses but these are not right for this . . . . [W]e would recommend decreasing his dose if possible. [H]e is currently cutting his fentanyl patches - - in half, for what reason, I am not really sure. The story seems to go round and round and I am unable to detect why he is cutting them in half. But, nonetheless, they need to be decreased if possible.

In addition to the pain specialist referral, Dr. Lebedowicz referred Frost to a neurosurgeon, a sports medicine specialist, and an orthopedist. At an appointment with Dr. Lebedowicz in September of 2013, the patient intake notes reflect that Frost "[t]ried to quit [the] [p]atch but was unable to do without." Dr. Lebedowicz intended to reduce Frost's opioids in the event of a successful pain reduction by other means. In September of 2014, Frost tried to reach Dr. Lebedowicz by telephone and left messages stating that his prescribed opioids were not controlling his pain, he suspected the medication was fake, he went to the emergency room but was unable to secure narcotics, and he had to acquire some pills from his brother-in-law. Dr. Lebedowicz met with Frost and increased his oxycodone dosage, thereby increasing Frost's total opioid dosage with the fentanyl patch to 300 MME per day. Dr. Lebedowicz also ordered a urine screen to ensure compliance with the prescription regimen. The urine screen confirmed the presence of the prescribed opioids but also revealed the presence of marijuana, which was illegal at the time.

3

Dr. Lebedowicz withdrew as Frost's primary care physician the following January of 2015, noting he felt very uncomfortable providing additional care after Frost admitted he was using marijuana to treat his pain. Frost reported that he had ran out of his prescribed opioids, had been experiencing uncontrollable crying spells, and was in extreme pain. Dr. Lebedowicz observed that Frost "may be going through withdrawal." Dr. Lebedowicz refilled Frost's medications and arranged for another Medical Group physician, Dr. Donald James to take over Frost's pain management needs going forward.

As his primary care physician, Dr. James had a total of four appointments with Frost occurring between January 2015 and February 2016. During this period, Dr. James continued Frost on the same opioid regimen Dr. Lebedowicz had established, amounting to approximately 300 MME per day. Dr. James warned that he would not serve as Frost's physician if Frost continued to smoke marijuana. In February 2016, Dr. James noted that Frost had continued his opioid regimen and had "done well with no new complaints." In May of 2016, Frost informed Dr. James that he had quit consuming marijuana as instructed. Dr. James accepted a managerial position in the summer of 2016 and ultimately transferred the care and treatment of Frost to another Medical Group physician, Dr. Chadwell Vail.

Dr. Vail's first visit with Frost occurred in July of 2016, at which time Frost discussed his history of chronic pain and reported feeling "well controlled on [the] current medication regimen." Dr. Vail continued Frost on this regimen and, although Frost did not appear at his next scheduled visit, Frost was able to continue receiving his scripts by going to Dr. Vail's office once a month and speaking to staff members to confirm the regimen was still effective and that he was not experiencing any problems.

It was almost a year later, in June of 2017, when Dr. Vail next saw Frost in an

4

appointment setting. At that visit, Frost expressed a desire to be off of fentanyl completely and claimed he was attempting to wean himself down from the prescribed dosage that had been in place since April of 2013. Dr. Vail responded by reducing Frost's fentanyl dosage by fifty percent and maintaining his oxycodone dosage.

About three months later, Frost called Dr. Vail's office and reported that the reduced fentanyl dosage did not control his pain. Dr. Vail elected to "meet in the middle" and thereby "establish a new pharmacologic baseline[.]" This new baseline for Frost's fentanyl patch, when combined with his unchanged oxycodone dosage, amounted to approximately 250 MME per day.

The next time Dr. Vail saw Frost was in June of 2018. During that visit, Dr. Vail had a conversation with Frost regarding the 2016 guidelines from the Centers for Disease Control ("CDC guidelines"). Dr. Vail informed Frost that his opioid doses were "not feasible long-term[,]" and Frost "verbalized understanding." Frost disclosed that he had been procuring pain medication off the street and altering his fentanyl patches by cutting them in half. Frost also reported that he met with a surgeon for an evaluation and was informed he was not a candidate for any surgical relief to address his chronic pain. Dr. Vail directed Frost not to use nonprescribed narcotics, continued him on his current opioid regimen, and referred him to physical therapy and pain management to explore the possibility of non-narcotic treatments.

Over the course of the next few days, Frost made several phone calls to Dr. Vail's office "ranting and crying" and, among many other allegations, stating he "is convinced that the government is going to take his medications away from him." These calls led Dr. Vail to believe that Frost was undergoing a psychiatric crisis. Dr. Vail reached out to a psychiatrist and, with the psychiatrist's approval, requested that the Rolla police department conduct a wellness check on Frost. Dr. Vail assessed Frost in-person once more in June of 2018 following the wellness

5

check. As a result of that assessment, Dr. Vail diagnosed Frost with a narcotic addiction and made pain management and psychiatric referrals.

Frost had appointments with Dr. Vail in July, August, and October of 2018. In August, Dr. Vail stressed the importance of Frost following up with a psychiatrist and attempted to secure earlier dates for Frost's pain and psychiatric referrals. Frost, however, did not appear for the scheduled psychiatric appointment. Dr. Vail mandated Frost to enter into a "Controlled Substance/Opiate Pain Management Contract" requiring him to, among other things, not deviate from his medication regimen. Thereafter, in October, Frost stated that he had been taking a unprescribed medication, Lyrica, which he acquired from his father, and that with the fentanyl patch and Lyrica he was completely pain free. Dr. Vail informed Frost before he could receive any new prescription for pain control, he needed to follow up with his pain management and psychiatry referrals. Frost followed up on his pain management referral but did not want the recommended steroid injections and asked to be prescribed Lyrica. This request was denied because Frost admitted he was still smoking marijuana. At this time, Frost indicated he wanted a new primary care physician and accused Dr. Vail of lying to him.

The following November, Dr. Vail provided Frost a termination notice regarding their physician-patient relationship, effective thirty days from receipt of the letter. On the day after Dr. Vail's termination letter, Frost met with a psychiatrist who assessed him as having "either bipolar or schizoaffective history that he refuses to treat with psychotropics, instead choosing to believe improved pain leads to improved symptoms, or willing to treat with marijuana." The psychiatrist further observed that Frost "likely has either schizophrenia processes or severe personality disorder that is making him feel persecuted rather than seeing his part in the problem, and creating untrue narratives about his doctors."

Following the discontinuation of treatment by Dr. Vail, Frost attempted to procure opioids at emergency rooms, was placed on a psychiatric hold, and transferred to a facility specializing in cognitive disorders where he threatened to hurt himself or others if he did not get pain medication. Frost found a physician willing to prescribe opioid medications until that relationship ended several months later. Finally, Frost went to St. Mary's Pain Center, which utilized steroid injections (a treatment previously offered to, but refused by Frost) and local anesthetics to control Frost's pain to achieve pain control without opioids.

In October of 2019, Frost filed a negligence action against Medical Group for the treatment he received between 2011 and 2018, seeking both compensatory and punitive damages. The petition referenced treatment by both Dr. Lebedowicz and Dr. Vail, but not Dr. James. In its answer, Medical Group generally denied Frost's allegations and affirmatively alleged, among other allegations, that the "claims against [Medical Group] for the conduct of Dr. Lebedowicz are time-barred under [section] 516.105, in that the claim is brought more than two years after the last day of treatment by Dr. [Lebedowicz]." Thereafter, Medical Group moved for partial summary judgment, arguing that "[Frost]'s claim for medical negligence against [Medical Group] is a vicarious liability claim for the underlying alleged negligence of [Medical Group]'s physicians, Dr. Lebedowicz, Dr. James, and Dr. Vail" and "[b]ecause [Frost] filed suit more than two years after the date of the alleged negligent care by Drs. Lebedowicz and James, [Frost]'s vicarious liability claim against [Medical Group] for their alleged negligence is time-barred as a matter of law." Frost responded that the "continuing care" exception prevented the running of the statute of limitations. Ultimately, the circuit court overruled Medical Group's motion and the case proceeded to trial.

At trial, Medical Group stipulated that, during the respective treatment of Frost by Dr.

7

Lebedowicz, Dr. James, and Dr. Vail, each physician was employed by Medical Group and acting within the course and scope of that employment. A representative of Medical Group testified that he believed all physicians, not just those employed by Medical Group "are aware of issues related to medications across the spectrum of risk as we deal with in our daily practices." The representative stated that Medical Group does not have any policies or procedures regarding the monitoring or prescribing of opioids to its patients.

In addition to testimony from the Medical Group representative, Dr. Lebedowicz, Dr. James, Dr. Vail, and Frost, the parties offered testimony from three experts. The first of these witnesses, Dr. Paul Genecin testified on behalf of Frost during his case-in-chief. Dr. Genecin pointed to the CDC Guidelines and guidelines adopted in 2013 by the State Medical Board of Ohio ("Ohio Guidelines") as summarizing the applicable standards of care. Although the CDC and Ohio Guidelines were adopted in 2016 and 2013, respectively, Dr. Genecin testified that the safety practices listed therein have been well-known by the medical community for several decades. Over hearsay objections by Medical Center, the circuit court admitted the CDC and Ohio Guidelines into evidence. Generally, per the CDC and Ohio Guidelines, nonpharmacologic and nonopioid pharmacologic therapies are preferred treatments for chronic, nonterminal pain; before starting and periodically throughout opioid treatment, risk and benefits should be discussed and drug testing should occur to assess for prescribed medications and other controlled prescriptions and illicit drugs; opioid therapy should involve the lowest dosage possible for the shortest time possible and only continue if there is clinically meaningful improvement to pain and function that outweighs risks; and daily prescribed opioid dosages totaling or exceeding 80 MED (the Ohio Guidelines threshold) or 90 MME (the CDC Guidelines threshold) should be avoided altogether or trigger additional scrutiny. Dr. Genecin opined that the treatment and care

8

Frost received from Medical Group fell below applicable standards of care because Medical Group failed to have any polices or procedures concerning opioid medications, failed to conduct a risk assessment on Frost, prescribed excessive opioid doses to Frost for an excessive amount of time, and failed to adequately monitor Frost's use of opioid medications. Dr. Genecin further opined that action and inactions by Medical Group caused Frost to become addicted to opioids.

Dr. Nathaniel Moore was the first of Medical Group's two testifying experts. Dr. Moore testified that the CDC did not have the authority to license or regulate physicians and, in Dr. Moore's opinion, guidelines from 2016 should not be used to judge the treatment and care by physicians that occurred before those guidelines were issued. Dr. Moore characterized Frost's 300 MME opioid regimen as being on the "higher side" but not inappropriate, noting that patients develop tolerance to opioids over time and, as a result, require higher doses to maintain previous levels of pain control. It was Dr. Moore's opinion that there is a lack of consensus as to how to treat chronic pain and it would be difficult to codify a single set of rules governing the issue.

Dr. Todd Meyerhoefer, Medical Group's second expert, offered similar opinions. In Dr. Meyerhoefer's opinion, there was no deviation from standards of care by Medical Group and its physicians. According to Dr. Meyerhoefer, physician groups like Medical Group do not typically have uniform policies governing treatment as such a policy would be difficult to implement and impractical.

The jury received comparative fault verdict directors on Frost's claim of negligence. As to the verdict director applicable to Medical Group's conduct, the jury was instructed they must assess a percentage of fault to Medical Group if it believed Medical Group either (1) "[f]ailed to weigh the risks and benefits of prescribing opioids to [Frost]," (2) "[o]verprescribed opioids to

[Frost]," (3) "[f]ailed to monitor [Frost]'s opioid treatment," or (4) "[f]ailed to assess [Frost] for dependency or addiction[.]" Medical Group unsuccessfully objected to these submissions, asserting that the first, third, and fourth were "vague and ambiguous" and that the second was a "roving commission." The verdict director further required the jury to find that the aforementioned conduct was negligent—defined as the failure to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of Medical Group's profession—and that such negligence directly caused or directly contributed to cause damage to Frost.

The jury also received a verdict director allowing it to assess punitive damages against Medical Group. Medical Group unsuccessfully objected to this verdict director, asserting, among other things, that it was unsupported by clear and convincing evidence. Per the verdict director, patterned upon Missouri Approved Instruction ("MAI") 10.02, the jury could find Medical Group liable for punitive damages if they assessed a percentage of fault to Medical Group under the negligence verdict director and if they believed the conduct by Medical Group submitted in the negligence verdict director "showed complete indifference to or conscious disregard for the safety of others[.]" The jury was further instructed that it may consider "harm" to others in making the aforementioned determination with the restriction that the jury "must not include damages for harm to others who are not parties to this case."

On Frost's claim for compensatory damages, the jury returned a verdict finding that Frost incurred past non-economic damages of $200,000 and assessing ten percent of the fault to Medical Group and ninety percent of the fault to Frost, resulting in a net compensatory award of $20,000. Additionally, the jury assessed $500,000 in punitive damages against Medical Group.

The circuit court entered judgment on the aforementioned verdicts. Medical Group thereafter filed a motion for judgment notwithstanding the verdict, for a new trial, and for remittitur. Among its several arguments, Medical Group asserted that the punitive damages award violated due process in that it was constitutionally excessive. The circuit court overruled Medical Group's motion in all respects, save one—it granted Medical Group's request to reduce the compensatory damages by $10,000.00, which was an amount reached in a settlement between Frost and another defendant in the case.

Medical Group timely appeals the circuit court's judgment, raising six points. For ease of analysis, we review some of Medical Group's points together and out of order.

## Discussion

### *Point 1 – Statute of Limitations*

In its first point, Medical Group contends that the circuit court erred in refusing to apply the statute of limitations. Medical Group observes that the statute of limitations bars medical malpractice claims more than two years old and argues "the continuing-care exception did not apply here," for the reasons that "a medical malpractice claim against an employer is derivative of the underlying claim against the physician, and the claims against Dr. Lebedowicz and Dr. James were barred by the two-year limitations period."[2] We disagree.

"Whether a statute of limitations applies to a given cause of action is reviewed *de novo*."

---

[2] We note that Frost argues that Medical Group did not preserve its claim in this point as to Dr. James specifically because the affirmative defense set out in Medical Group's pleading referred only to Dr. Lebedowicz. The reason for this omission, however, presumably stems from the fact that Frost's pleading was likewise silent as to any claim involving Dr. James. Regardless, the issue of whether the statute of limitations prevents a vicarious liability claim against Medical Group based upon the conduct of Dr. James was tried by implied consent, by being raised and thoroughly argued by the parties in their summary judgment filings where evidence relevant only to that issue was submitted without objection. "[I]ssues not raised in the pleadings are considered, in all respects, as if they had been raised by the pleadings when they are tried by implied or express consent of the parties." ***Bone v. Dir. of Revenue***, 404 S.W.3d 883, 886 (Mo. banc 2013).

11

*Baldwin v. Baldwin*, 667 S.W.3d 199, 204 (Mo.App. 2023) (internal quotation marks omitted). As applicable here, all actions against any "entity providing health care services . . . shall be brought within two years from the date of occurrence of the act of neglect complained of[.]" Section 516.105.1.[3] But under the judicially-created "continuing care" exception, this statute of limitations does not begin to run if "the treatment is continuing and of such nature as to charge the medical [provider] with the duty of continuing care and treatment which is essential to recovery until the relation ceases . . . ." *Thatcher v. De Tar*, 173 S.W.2d 760, 762 (Mo. 1943). "The duty to attend the patient continues so long as required unless the physician-patient relationship is ended by (1) the mutual consent of the parties, (2) the physician's withdrawal after reasonable notice, (3) the dismissal of the physician by the patient, or (4) the cessation of the necessity that gave rise to the relationship." *Weiss v. Rojanasathit*, 975 S.W.2d 113, 119-20 (Mo. banc 1998).

Medical Group's primary argument consists of two prongs. The validity of the first prong—that the statute of limitations has run on any claims by Frost against Dr. Lebedowicz and Dr. James—is undisputed. Frost acknowledges that Dr. Lebedowicz and Dr. James individually ended their physician-patient relationship with Frost in 2015 and 2016, respectively, by withdrawing after reasonable notice. Their individual duties to attend to Frost, therefore, did not *continue* beyond these dates.

Medical Group's argument, however, fails with its second prong. Medical Group cites *Tiemann v. SSM Reg'l Health Servs.* for the principles that "[c]laims asserting vicarious liability against an employer and claims for loss of consortium by a spouse, are both derivative of the patient's underlying negligence claim against the physician" and "[n]either a vicarious

---

[3] All statutory references are to RSMo 2016 as updated through RSMo Cum.Supp. (2018), unless otherwise noted.

liability claim, nor a loss of consortium claim, can exist without a viable underlying negligence claim by the injured patient against the treating physician." 632 S.W.3d 833, 843 (Mo.App. 2021). Thus, because any claims against Dr. Lebedowicz and Dr. James individually are barred, then, under *Tiemann* and according to Medical Group, "[t]he derivative claims against the Medical Group based on those doctors' actions are similarly barred." A decision by our high court, in *Montgomery v. South County Radiologists, Inc.*, provides otherwise.

*Montgomery* addressed whether summary judgment was appropriate in favor of two defendants on the defense that the statute of limitations had run. 49 S.W.3d 191, 193 (Mo. banc 2001). The first issue was whether the continuing care exception saved the negligence and loss of consortium claims against the first of three radiologists who provided services to a plaintiff. *Id.* Our high court held that the continuing care exception *did not apply* to the claims against the radiologist because he only provided his diagnostic services on a single date and, excluding certain exceptions, "[w]here a physician commits an act of neglect on one specific date, and has no other contact with the patient, the statute of limitations begins to run on that date . . . ." *Id.* at 194. The second issue was whether the same exception saved the same claims brought against the healthcare entity that employed the three radiologists to the extent those claims involved the allegedly negligent actions by the first radiologist. *Id.* On this issue, and despite its holding on the first issue, our high court held that the exception *did apply* based upon the summary judgment record of services the healthcare entity provided the plaintiff *including and beyond* the services administered by the first radiologist. *Id.* at 194-95. This resolution wholly refutes the second prong of Medical Group's argument.

We also note that *Tiemann* was not decided by our high court and does not stand for Medical Group's asserted proposition. That case addressed and rejected a contention that the

13

continuing care exception cannot apply to claims of vicarious liability against an employer or for loss of consortium by a spouse. 632 S.W.3d at 842-43. Such claims, the court observed, "are both derivative of the patient's underlying negligence claim against the physician." *Id.* at 843. It was in *this context* that the court observed that "[n]either a vicarious liability claim, nor a loss of consortium claim, can exist without a viable underlying negligence claim by the injured patient against the treating physician." *Id.* As such, whether a vicarious liability claim against a healthcare entity can be maintained when the statute of limitations has run against the physician was not at issue or decided by *Tiemann*. *See id.* The case merely espouses that the claim against the healthcare entity arises from a claim against the physician and, therefore, both are subject to the continuing care exception. *See id.*

Medical Group attempts to distinguish *Montgomery* from the instant case, arguing that the primary-care services it provides are different than the radiology services of the healthcare entity in that case. But we fail to see how this distinction is material. In *Montgomery*, our high court stated that healthcare entities have a duty of continuing care and "[t]he plain language of section 516.105 *does not distinguish between types of providers*, but covers any 'entity providing health care services.'" 49 S.W.3d at 195 (emphasis added).[4]

Medical Group also argues that "finding in Frost's favor would frustrate the strong public policy of a short fuse on medical malpractice actions" and surmises that "[p]ractice groups, especially large ones with many doctors, would be on the hook for years—decades even—for alleged malpractice stemming from treatment of chronic conditions." While this may be so, our resolution of Medical Group's point is unaffected. "We are constitutionally bound to follow the

---

[4] The statutory citation to section 516.105 in *Montgomery* was to RSMo 1994. 49 S.W.3d at 193. Like the version discussed in *Montgomery*, the version of section 516.105.1 applicable to the instant case, also applies to any entity providing health care services.

14

controlling decisions of the Missouri Supreme Court." ***Chambers v. Figgie Int'l, Inc.***, 838 S.W.2d 168, 171 (Mo.App. 1992). The Missouri Court of Appeals is an error-correcting court, not a policy-making court. ***Arvest Bank v. Emerald Pointe, LLC***, 641 S.W.3d 379, 385 (Mo.App. 2022).

In conclusion, Medical Group physicians Dr. Lebedowicz, Dr. James, and Dr. Vail each attended to Frost in some capacity beginning in 2011 and ending in 2018, less than two years before Frost filed his petition. We need not determine, however, whether the details of such care actually support the conclusion that Medical Group had a continuing duty for that entire period.[5] The *only* legal reason Medical Group provides in support of its claim of reversible error is its blanket contention that the continuing care exception *cannot apply* to a derivative claim that is based in part upon the actions of a physician against whom the statute of limitations has individually run. In light of ***Montgomery***, this proffered legal reason fails as a matter of law. Accordingly, on this basis, Medical Group has failed to demonstrate circuit court error in the refusal to apply the statute of limitations to Frost's allegations involving Dr. Lebedowicz and Dr. James. Point 1 is denied.

### Points 5 and 6 – CDC and Ohio Guidelines

In its fifth point, Medical Group contends that the CDC Guidelines were inadmissible hearsay and, therefore, the circuit court abused its discretion in admitting the exhibit into evidence. In its sixth point, Medical Group presents the same hearsay argument as to the Ohio Guidelines. These exhibits came into evidence during the testimony of Dr. Genecin, who

---

[5] We note that as to the corporate entity in ***Montgomery***, the specific factual context unique to that case demonstrating a duty of continuing care was that "[o]n three occasions in a nine-month period, [the plaintiff] made the same complaint about the same part of his body to his neurosurgeon" and "[t]he neurosurgeon ordered three tests from [the corporate entity defendant], which provided three reports, each report comparing itself to the immediately preceding report." 49 S.W.3d at 194-95.

15

testified the exhibits were authoritative in the medical profession and he relied on them for his opinion that Medical Group violated the applicable standards of care. Because Medical Group fails to adequately address the applicability of section 490.065, the statute pertaining to the admissibility of evidence pertaining to expert witnesses, its hearsay challenge fails.

"The trial court has broad discretion in determining whether to admit or exclude evidence, and we review for an abuse of that discretion." *Porter v. Dir. of Revenue*, 168 S.W.3d 147, 150 (Mo.App. 2005). "The appellant has the burden of showing the abuse of discretion and the prejudice resulting therefrom." *Id.*

The parties agree that Dr. Genecin could rely on the CDC and Ohio Guidelines in forming his opinions. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Section 490.065.2(2). Moreover, even if the facts or data are inadmissible hearsay, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.* The problem, according to Medical Group, is that the circuit court admitted those exhibits into evidence and allowed Dr. Genecin to read from them verbatim during his testimony. But section 490.065.2(2) further provides, however, that "if the facts or data would otherwise be inadmissible, the proponent of the opinion *may disclose them to the jury* only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." (Emphasis added.) Thus, under the applicable statute, disclosing the evidence at issue was *not* a problem, even if it was inadmissible hearsay, so long as it satisfied the criteria expressly provided for within the statute.

Yet, Medical Group fails to present any argument that the prejudicial effect of the CDC and Ohio Guidelines *substantially* outweighed their probative value in helping the jury evaluate

16

Dr. Genecin's opinion testimony. Therefore, even if those exhibits were inadmissible hearsay, Medical Group failed its burden in demonstrating their disclosure was an abuse of discretion under section 490.065.2(2). Points 5 and 6 are denied.

*Point 2 – Negligence Verdict Director*

In its second point, Medical Group contends that the circuit court erred in submitting the negligence verdict director allowing the jury to assess a percentage of fault to Medical Group. The legal reason Medical Group offers in support of this claim is "that the instruction was an improper 'roving commission'" and directs its challenge specifically at "the paragraph describing the allegedly negligent acts" for the reason that the paragraph "was too general and vague, allowing each juror to choose any fact that suited his or her fancy or perception of logic to impose liability." But before we reach the merits of this claim, we must first address whether, as Frost argues, it is even preserved for review.

We begin with Frost's argument that point 2 contains no assertion of prejudice. "An instructional error is only grounds for reversal when the instruction misdirected, misled, or confused the jury and resulted in prejudice." *Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 413 (Mo. banc 2019) (internal quotation marks omitted). Where a point relied on asserting instructional error contains no assertion of prejudice, the result is a failure to preserve any claim of prejudice for our review. *Harned v. Spurlock*, 658 S.W.3d 562, 575 (Mo.App. 2022). But here, we disagree with Frost's assessment. "An instruction is considered prejudicial where it submits a legal question in an abstract way giving the jury a roving commission to return a verdict without being limited to any issues of fact or law developed in the case." *Citizens Bank v. Schapeler*, 869 S.W.2d 120, 129 (Mo.App. 1993). Medical Group's assertion that the negligence verdict director "allow[ed] each juror to choose

17

any fact that suited his or her fancy or perception of logic to impose liability" is sufficient to meet this standard.

To address Frost's remaining preservation arguments, we turn next to "the paragraph describing the allegedly negligent acts" found within the negligence verdict director. That paragraph asked the jury if it believed that Medical Group (1) "[f]ailed to weigh the risks and benefits of prescribing opioids to [Frost]," (2) "[o]verprescribed opioids to [Frost]," (3) "[f]ailed to monitor [Frost]'s opioid treatment," or (4) "[f]ailed to assess [Frost] for dependency or addiction[.]" As clarified by its argument, Medical Group challenges each and every one of these four submissions as amounting to a roving commission.

Frost compares Medical Group's challenge to a similar challenge raised in *Harned*, 658 S.W.3d at 574. In that case, in a single point, the defendants asserted that two verdict director submissions—asking the jury whether the defendants "failed to arrange the appropriate level of psychiatric care for [the plaintiff] upon discharge," or "failed to provide [the plaintiff] with the appropriate psychiatric medications"—were vague, unsupported by the evidence, and a roving commission. *Id.* The *Harned* court held that this point was impermissibly multifarious because "it raises multiple, divisible claims of error by challenging two separate submissions in the verdict director." *Id.* We agree with Frost that Medical Group's point is analogous to the impermissibly multifarious point in *Harned*. Improper points preserve nothing for review, and we may choose not to review them. *Cedar Cnty. Comm'n v. Governor Michael Parson*, 661 S.W.3d 766, 772 (Mo. banc 2023). We have the discretion, however, to review deficient points *ex gratia*. *Id.* "When the point is multifarious, such *ex gratia* review can be limited to one of the improperly combined points, often the first one." *Id.*

18

Here, we elect to follow the guidance of *Cedar Cnty. Comm'n* to exercise *ex gratia* review limited to only one of the challenged submissions in the negligence verdict director. As to the first challenged submission, however—whether Medical Group "[f]ailed to weigh the risks and benefits of prescribing opioids to [Frost]"—counsel for Medical Group objected at trial only on the ground that it was "vague and ambiguous[.]" Hence, no specific and distinct "roving commission" objection was levied against this particular submission. As Frost also correctly observes, "[t]o preserve a claim of instructional error for appellate review, the specific objection raised on appeal must have been made at trial stating distinctly the matter objected to and the grounds of the objection." *Harned*, 658 S.W.3d at 575-76; *see also* Rule 70.03 (stating "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds of the objection").[6] It was not until addressing the second challenged submission—whether Medical Group "[o]verprescribed opioids to [Frost]"—that counsel for Medical Group specifically and distinctly objected on the basis that it is a "roving commission." Thus, we limit our *ex gratia* review to the second submission and, for the reasons provided below, determine that Medical Group's challenge to it is without merit.

We review claims of instructional error *de novo*. *Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 191 (Mo. banc 2014). "A roving commission occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury to roam freely through the evidence and choose any facts which suit its fancy or its perception of logic to impose liability." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010) (internal quotation marks omitted). "If an instruction fails to advise the jury what acts or

---

[6] All rule references are to Missouri Court Rules (2022).

omissions of the party, if any, found by it from the evidence would constitute liability, the instruction is a roving commission." **Coon v. Dryden**, 46 S.W.3d 81, 92-93 (Mo.App. 2001). "A jury instruction may also be considered a roving commission when it is too general or where it submits a question to the jury in a broad, abstract way without any limitation to the facts and law developed in the case." **Id.** at 93.

"A proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." **Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.**, 168 S.W.3d 488, 497-98 (Mo.App. 2005) (emphasis added); *see also* Rule 70.02(b) (stating that when a Missouri Approved Instruction is modified, as was the case here, then "such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts"). "To avoid a roving commission, the court must instruct the jurors regarding the specific conduct that renders the defendant liable." **Rinehart v. Shelter General Ins. Co.**, 261 S.W.3d 583, 594 (Mo.App. 2008) (internal quotation marks omitted). Additionally, where the phrase used in the verdict director that requires explanation is explained by testimony, there is no roving commission. **Klotz**, 311 S.W.3d at 767.

In support of its contention that the challenged submission in the negligence verdict director amounted to an improper roving commission, Medical Group relies heavily on **Bell v. Redjal**, 569 S.W.3d 70, 94-95 (Mo.App. 2019), which involved a claim of medical negligence arising out of a surgery occurring on a particular date. In *dicta*, the **Bell** court noted that if the verdict director "merely required the jury to find [the defendant] 'failed to inform [the plaintiff] of fractures' or 'delayed treatment of fractures,' the instruction would have certainly been too general." **Id.** at 95. This was not the case, however, as the verdict director "used the term

20

'fractures' immediately followed by the limiting language 'which occurred during the April 16, 2014 surgery.'" *Id.* Thus, the jury "was instructed to consider only the fractures suffered during the surgery, not the ones incurred after surgery." *Id.* According to Medical Group, the negligence verdict director in the instant case was too general, akin to the hypothetical verdict director in *Bell*. But nothing in *Bell* stands for the proposition that granular detail is required in verdict directors merely for specificity's sake. Rather, the issue *Bell* addressed was whether a challenged verdict director instructed the jury using *only* ultimate facts. *See id.* Ultimate facts are those the jury must find to return a verdict for the plaintiff. *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 463 (Mo. banc 2017). In *Bell*, certain failures by defendant to act relating to a particular surgery on a particular date were "ultimate facts necessary for the jury to understand Plaintiff's theory of negligence[,]" 569 S.W.3d at 95, while failures to act *after* the surgery apparently were not. Thus, the inclusion of the date of the surgery was deemed adequate to prevent the jury from potentially conflating nonactionable facts with ultimate, actionable facts. *See id.*

Medical Group also relies on *St. Joseph's Hosp. v. Schierman*, 829 S.W.2d 4 (Mo.App. 1991). In that case, the challenged verdict director tasked the jury with determining whether or not the defendant physician had "failed to adequately communicate with [another physician] regarding the giving of Aramine." *Id.* at 6. We previously addressed and distinguished this case, stating "[t]his instruction required a jury of laymen to determine whether nonspecific medical information communicated by one medical expert to the other was adequate for the second medical expert to properly treat the patient." *Lashmet v. McQueary*, 954 S.W.2d 546, 552 (Mo.App. 1997). In other words, "the instruction required the jury to speculate and utilize medical expertise that it did not possess." *Id.*

21

Medical Group does not argue that if it "[o]verprescribed opioids to [Frost]," such conduct would not amount to actionable negligence per Frost's theory of the case. Thus, **Bell** is inapplicable. Medical Group complains that Dr. Genecin "expos[ed] the jury to a plethora of encounters [with Medical Group physicians] that a jury could consider against the too-general instructions." We acknowledge the amount of complex medical evidence presented to the jury in this case, but Medical Group's complaint has nothing to do with whether the challenged submission required the jury to utilize medical expertise it did not possess as was the case in **Schierman**. Rather, as Medical Group sees it, the roving commission occurred for the reason that "any number of perceived actions or inactions based on an individual juror's whims" allowed the jury to find Medical Group negligent. A case decided by the eastern district of this Court, **Blanks v. Fluor Corp.**, 450 S.W.3d 308 (Mo.App. 2014), illustrates the flaw in Medical Group's argument.

In **Blanks**, a jury had found the defendants negligently allowed several children in a community to be exposed to unsafe levels of lead. **Id.** at 323-24. On appeal, the defendants contended that certain verdict-directing instructions amounted to a roving commission. **Id.** at 395. Specifically, the defendants asserted that "the phrase 'allowed plaintiff to be exposed to unsafe levels of lead' was too open-ended and vague, and left it to the 'whim' of the jurors to decide for themselves the conduct they could consider in deciding whether to hold defendants liable." **Id.** The defendants "insist[ed] that the instructions should have specified what defendants did or did not do to 'allow' the exposure or make them liable to the children. The **Blanks** court disagreed, stating as follows:

> The ultimate issue to be decided in this case was whether defendants allowed the children to be exposed to unsafe levels of lead. In the context of this case, the defendant[s'] various acts and omissions were evidentiary detail. Be it defendants' failure to warn, to buy out the homes, to contain emissions, to

22

honestly communicate to the town, or any other of defendants' acts or omissions, the end result is the same—the act or omission allowed the children to be exposed to unsafe levels of lead. The term "allowed" was sufficiently given "flesh and meaning" during the trial, and unlike the [instructions from other cases cited by the defendants], does not include both actionable and non-actionable conduct. The submission was entirely responsive to the negligence pleaded in the children's petition and established at trial. We hold that the verdict directors did not constitute a roving commission.

*Id.* at 398.

Here, whether Medical Group "[o]verprescribed opioids to [Frost]" was an ultimate issue in the case. The term "[o]verprescribed" was given *flesh and meaning* by the testimony of Dr. Genecin. The specific acts and omissions by Medical Group that could have satisfied the challenged submission were mere evidentiary detail. And that there was potentially many such acts and omissions does not transform the challenged submission into a roving commission. Point 2 is denied.

### Points 3 and 4 – Punitive Damages

In its third point, Medical Group contends that the circuit court erred in submitting the punitive damages verdict director because the evidence did not warrant a submission of punitive damages. In its fourth point, Medical Group contends that the circuit court erred in refusing to reduce the punitive damages award because it was constitutionally excessive in violation of due process. We find merit in point 3.

Punitive damages are "damages intended to punish or deter willful, wanton or malicious misconduct, including exemplary damages and damages for aggravating circumstances[.]" Section 538.205(11). The remedy of punitive damages "is so extraordinary or harsh that it should be applied only sparingly." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996). Punitive damages against a health care provider "shall be made only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious

23

misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition." Section 538.210.8. "For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others." *Bell*, 569 S.W.3d at 89.[7] Punitive damages "are not generally recoverable in negligence actions because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Dodson v. Ferrara*, 491 S.W.3d 542, 563 (Mo. banc 2016) (internal quotation marks omitted). "But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted." *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985) (quoting *Sharp v. Robberson*, 495 S.W.2d 394, 397 (Mo. banc 1973). "[P]unitive damages can be awarded in a negligence action but only when the defendant knew or had reason to know that there was a *high degree of probability* that the action would *result in injury*." *Id.* at 436.

"Whether there is sufficient evidence to support an award of punitive damages is a question of law, which we review *de novo*." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict. *Rhoden v. Missouri Delta Med. Ctr.*, 621 S.W.3d 469, 477 (Mo. banc 2021). "Appellate authority does not supply missing evidence or give [the plaintiff] the benefit of unreasonable, speculative, or forced inferences." *Peters v. General*

---

[7] We note that, although not applicable in this case, the standards for determining whether a health care provider may be subject to punitive damages have been amended. Section 538.210.8, RSMo Cum.Supp. (2020), now states that an award of punitive damages shall be made only upon clear and convincing evidence that the health care provider "intentionally" caused or demonstrated "malicious misconduct" that caused damage to the plaintiff and "[e]vidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct."

24

*Motors Corp.*, 200 S.W.3d 1, 24 (Mo.App. 2006).

A submissible case for punitive damages requires clear and convincing proof. *Rodriguez*, 936 S.W.2d at 110. This standard requires evidence "which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved. *Peters*, 200 S.W.3d at 25 (internal quotation marks omitted). "In a search for clear and convincing evidence, the circuit court must scrutinize the evidence in much closer detail than it does in cases in which the standard of proof is a mere preponderance." *Id.* (internal quotation marks omitted). Additionally, "[s]ubmission of a punitive damages claim to the jury warrants special judicial scrutiny because the instructional standards for punitive damages are necessarily general." *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 247 (Mo. banc 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013). When submitting punitive damages in a negligence case, a typical instruction to the jury is that, upon a finding of negligence, it should determine whether a defendant should have known that its conduct created a high degree of probability of injury and thereby showed complete indifference to or conscious disregard for the safety of others. *E.g.*, *Koon v. Walden*, 539 S.W.3d 752, 760 (Mo.App. 2017).[8] "To the jury 'the high degree of probability' may be satisfied by the mere fact

---

[8] In *Koon*, the jury was instructed that they must assess a percentage of fault to the defendants if they believed the defendants either (1) "failed to weigh the risks and benefits of prescribing opioids to [the plaintiff patient]," (2) "overprescribed opioids to [the plaintiff patient]," (3) "failed to monitor [the plaintiff patients]'s opioid treatment[,]" or (4) "failed to assess [the plaintiff patient] for dependency or addiction." 539 S.W.3d at 760. "The jury also had to find that this conduct was negligent—in that [the defendants] failed to use the degree of skill and learning ordinarily used under similar circumstance by members of [the defendants'] profession—and that this negligence caused or contributed to cause [the plaintiffs'] damages." *Id.* Regarding punitive damages, the jury was instructed that they could find the defendants liable if they determined that the defendants "knew or should have known that this conduct created a high degree of probability of injury and thereby showed complete indifference to or conscious disregard for the safety of others." *Id.* Unlike in *Koon*, however, the jury in the instant case was not directly instructed that they must determine Medical Group knew or should have known that the conduct outlined in the negligence verdict director created a high degree of probability of injury. *Compare* MAI 10.02 [2008 Revision] Negligence Constituting Conscious Disregard for Others (which was utilized in the instant case and omits the knowledge requirement), *with* MAI 10.07 [2008 Revision] Modification of MAI 10.02 – Submission of Specific

25

that [a] particular [injury] occurred." *Alcorn*, 50 S.W.3d at 248. "A defendant's aggressive defense at trial on either the issue of breach of duty or causation may supply, in the jurors' minds, the 'complete indifference' or 'conscious disregard' element." *Id.* "That is why careful judicial scrutiny is needed to determine whether the conduct was so egregious that it was tantamount to intentional wrongdoing." *Id.* (internal quotation marks omitted). "[T]he conduct must be such that injury is its natural and probable consequence." *Id.* (internal quotation marks omitted).

We find no such conduct here. In arguing otherwise, Frost compares the instant case to *Koon*. But that case is factually distinguishable. In *Koon*, the defendant physician began the plaintiff patient on an opioid regimen in 2008 to treat back pain after the patient "threw his back out and fell while drying off from a shower." 539 S.W.3d at 757. The defendant physician significantly increased the opioid regimen over the course of the next four years, with daily doses averaging 49.67 milligrams MED in 2008, 208 milligrams MED in 2009, 545.59 milligrams MED in 2010, 1,173.37 milligrams MED in 2011, and 1,555.94 milligrams MED in 2012. *Koon*, 539 S.W.3d at 759. A dose of 1,555.94 milligrams MED exceeded, by far, the highest average daily dose—300 MME—reached in the instant case. In fact, Dr. Genecin, who provided expert testimony in *Koon*, described the doses at issue in that case as "reckless"—a word that has material significance in the context of punitive damages. *Id.* at 759, 773; *see Hoover's Dairy,*

_____

Acts and Knowledge (which includes the knowledge requirement). Note 1 under MAI 10.02(iii) states that MAI 10.02 is not adequate to submit punitive damages where it refers to a negligence verdict director that does not itself contain a submission on the issue of the defendant's knowledge. *See generally Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 74-75 (Mo. banc 1990) (discussing circumstances where MAI 10.02 is inadequate to submit punitive damages), *overruled on other grounds by Rodriguez*, 936 S.W.2d at 110-11. Note 1 under MAI 10.02 further states the problems addressed in *Menaugh* should be resolved by utilizing MAI 10.07. Medical Group, however, fails to allege any error on appeal strictly regarding whether the punitive damages verdict director as submitted was in conformance with *Menaugh* or otherwise properly included all required elements. Because Medical Group only generally contends that the *evidence* did not warrant the submission of punitive damages, we confine our analysis to that issue alone.

*Inc.*, 700 S.W.2d at 435 ("This Court has recognized that in a case where liability is established by negligence the negligent conduct may further rise to the level of reckless so as to warrant punitive damages."). The ***Koon*** court held that because the defendant physician knew the risks in prescribing these amounts of opioids and nevertheless did so without adequate discussions as to the risks, without any monitoring system in place, and despite warning signs that his patient was dependent and possibility addicted, there was a submissible case for punitive damages against the physician and, by way of vicarious liability, his employer. ***Koon***, 539 S.W.3d at 773-75.

Frost ignores the opioid dose disparity between ***Koon*** and the instant case but attempts to draw parallels in other respects. Frost relies on the testimony of Dr. Lebedowicz and identifies several "red flags" for addiction that he asserts Dr. Lebedowicz ignored. The earliest of these red flags occurred in 2011 when Dr. Lebedowicz referred Frost to a pain management specialist. Frost, initially, failed to keep that appointment, thereby demonstrating that he may not always comply with physician instructions or adhere to therapy. Not long thereafter, in his 2012 sleep study, Frost admitted that he had abused illicit narcotics—heroin and cocaine—in the past, thereby demonstrating a propensity to abuse such or similar substances. We agree with Frost that Dr. Lebedowicz knew or should have known about these behaviors and that they are risk factors for addiction. At this stage, however, the identified risk factors are merely that—risk factors. Nothing here suggests that any injury to Frost is a natural and probable consequence of the failure to take any action at this time.

The next red flags Frost identifies arose in 2013. Frost would alter his fentanyl patches by cutting them into smaller pieces—a situation that came to Dr. Lebedowicz's attention when Frost finally followed up with the pain management specialist referral. As Frost explained

27

during his testimony, he cut his fentanyl patches to receive less of the medication, not more. This conduct was concerning, therefore, not necessarily because of a suggestion of dependency or addiction, but because it again demonstrated that Frost did not always follow instructions, altering a patch in an unregulated way affects the absorption of the medication, and a surplus of patches could be acquired by others. Dr. Lebedowicz addressed the situation, however, as Frost confirmed in his testimony, by instructing Frost to stop cutting his patches. Frost then misled Dr. Lebedowicz, as Frost also freely admitted, by agreeing to stop as instructed. Regardless, the fact that Dr. Lebedowicz intervened as he did demonstrates his *lack* of complete indifference or conscious disregard, not, as Frost suggests, the other way around.

Frost also notes that in a subsequent visit with Dr. Lebedowicz, also in 2013, one of his complaints, as reflected by the patient intake notes, was that he "[t]ried to quit [the] [p]atch but was unable to do without." Dr. Genecin testified that the inability to quit opioids is "one of the criteria for opioid use disorder" and that Dr. Lebedowicz should have begun to taper Frost off of opioids as he was beginning to show signs suggestive of addiction. Dr. Lebedowicz, however, was faced with imperfect options and had to make a judgment call. On one hand, Dr. Lebedowicz could have tapered Frost's opioids *without* a viable, non-opioid solution in place for pain control, or, on the other hand, attempted to find another way of treating Frost's pain—as Dr. Lebedowicz was exploring around the same time with referrals to a neurosurgeon, a sports medicine specialist, an orthopedist, and a pain management specialist—and *then* attempted, if and when these alternative methods were successful, to taper Frost's opioid regimen. Dr. Lebedowicz may have made the wrong decision at that time, and it may even have been a negligent decision, but, as before, nothing here suggests complete indifference or a conscious disregard for Frost.

28

The remaining red flags concern aberrant behaviors from late 2014 and early 2015 consistent with narcotic dependency or addiction—Frost's attempt to secure narcotics at an emergency room, his use of marijuana, that he ran out of his supply of prescribed opioids, and other behaviors suggesting to Dr. Lebedowicz that Frost may be going through withdrawal. Frost cites Dr. Lebedowicz's testimony that he intended to make a psychiatric referral at this stage to evaluate Frost for addiction but never did so because he transferred the care and treatment of Frost to Dr. James. Frost suggests the failure to make this referral, when presented with the aforementioned red flags, demonstrates Dr. Lebedowicz's complete indifference or conscious disregard. We disagree. As Frost's counsel aptly described the situation, "That notion of referring [Frost] to a psychiatrist due to his aberrant behavior kind of fell through the cracks[.]" A psychiatric referral that "fell through the cracks" in this context—the hand off of a patient from one physician to another—suggests negligence again, perhaps, but not something tantamount to intentional wrongdoing.

Moreover, nothing in the record reflects that Dr. James knew or had reason to know of any of the aberrant behaviors Frost previously exhibited—with the exception of Frost's marijuana use—at the time of this transfer. Frost, thereafter, informed Dr. James that he had quit using marijuana, and the record does not reflect that he displayed any additional aberrant behaviors during the year-and-a-half-long period Dr. James served as his primary care physician. The treatment and care of Frost then moved to Dr. Vail, to whom Frost initially reported feeling well controlled on current medication regimen. Again, although Frost may have previously displayed concerning aberrant behaviors, there was nothing, during this subsequent period where such behaviors were absent, to suggest that injury to Frost was the natural and probable consequence of any act or omission by Dr. Lebedowicz, Dr. James, or Dr. Vail.

29

It was not until after Dr. Vail attempted to reduce Frost's fentanyl dose, at Frost's request, and advised him concerning the CDC Guidelines, that Frost again revealed and began to display more aberrant behaviors. Frost argues that "rather than weaning him down, Dr. Vail allowed [Frost] to continue his downward spiral for an additional six months until he summarily discharged [Frost] from his practice." This argument is refuted by the record. Dr. Vail diagnosed Frost with a narcotic addiction, made appropriate referrals, required monthly check-ins by Frost to receive refills, and otherwise attempted to work with Frost without much success.

Frost further attempts to make an additional comparison between the instant case and *Koon*. Frost notes, correctly, that the court in *Koon* found there was also a submissible case for punitive damages directly against the defendant healthcare entity, separate and apart from any vicarious liability arising from the conduct of the defendant physician. 539 S.W.3d at 775. The court observed that, in light of its knowledge of an opioid epidemic, the defendant healthcare entity's "refusal to see a need for an opioid prescription monitoring system to keep account of the amounts of opioids being prescribed to its patients," demonstrated a "complete indifference to the safety of those patients." *Id.* The court further observed, "[t]here was a conscious decision on [the defendant healthcare entity]'s part to do nothing in the face of a known increased risk of addiction from opioids at higher dose levels." *Id.* Frost observes that, like the defendant healthcare entity in *Koon*, Medical Group, "at the time of trial, did not have any policies or procedures in place concerning chronic opioid medications, even with the acknowledgement that opioids are better understood at that time, than they were in years prior."

But again, *Koon* is distinguishable. A representative from the healthcare entity in that case demonstrated its complete indifference and conscious disregard by testifying that it "*saw no reason* to monitor opioids any differently than other medications." *Id.* at 760 (emphasis added).

30

The representative of Medical Group, in contrast, made no such dismissive statement.  Instead, he testified that a policy or procedure with respect to opioid prescribing would be "a noble task to undertake, potentially" but went on to explain that such a system would be "impractical" and "impossible" in the context of a multispecialty physicians' group such as Medical Group.  Nothing in this record demonstrates the complete indifference or conscious disregard exhibited by the healthcare entity in *Koon*, which knew of the opioid crisis but saw no reason to do anything, implying that nothing prevented it from implementing policies and procedures other than its own unwillingness to do so.

In sum, there is an extraordinarily high bar for the submission of punitive damages, as our high court in *Hoover's Dairy, Inc.*, made clear:

> The comments to [Restatement (Second) of Torts] § 500 makes [sic] it clear that the actor must either know or have reason to know that his or her act is substantially likely to cause physical harm.  Perhaps the classic example is of an individual firing a rifle into a moving passenger train.  There, the actor either knows or has reason to know that there is an unreasonable risk that a passenger will be hit.

700 S.W.2d at 435-36.  Here, however, for all of the foregoing reasons we discussed, the actions and inactions by Medical Group at issue were not so egregious so as to warrant this harsh remedy.  Point 3 is granted.

Having determined that there was no evidence warranting the submission of a punitive damage instruction, point 4—in which Medical Group claims the circuit court erred in refusing to reduce the punitive damages award on due process grounds—is moot and we need not address it.  *See Hoover's Dairy, Inc.*, 700 S.W.2d at 437 (declining to review alternative punitive damages claims in light of determination there was no evidence warranting submission of punitive damage instruction).

31

**<u>Decision</u>**

The circuit court's judgment for actual damages is affirmed, its judgment for punitive damages is reversed and remanded with directions to enter an amended judgment in conformity with this opinion.


BECKY J.W. BORTHWICK, J. – OPINION AUTHOR

JACK A. L. GOODMAN, C. J. – CONCURS

JENNIFER R. GROWCOCK, J. – CONCURS